ANUSHAVAN G. TOROSYAN *v.* BOEHRINGER
INGELHEIM PHARMACEUTICALS, INC.
(15146)

PETERS, C. J., and BORDEN, BERDON, NORCOTT and KATZ, Js.

2

Argued March 21—decision released July 4, 1995

*John C. King*, with whom were *Allyn M. Carnam* and, on the brief, *Karen P. Blado* and *Bruce W. Raphael*, for the appellant (defendant).

*Martin A. Gould*, with whom was *Nancy E. Gould*, for the appellee (plaintiff).

PETERS, C. J. The principal issue in this appeal is whether there was sufficient evidence to support the trial court's factual determinations of defamation and breach of an implied contract of employment. The plaintiff, Anushavan Torosyan, brought this action alleging that the defendant, Boehringer Ingelheim Pharmaceuticals, Inc., had terminated his employment in violation of an express contract, an implied contract and public policy, and that it had defamed him. After a court trial, the trial court rendered judgment in favor of the plaintiff only on the counts alleging breach of an implied contract and defamation. The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The trial court found the following facts. The plaintiff was employed as a chemist by the defendant beginning in November, 1982. Because of representations made to the plaintiff in his preemployment interviews and in an employee manual given to the plaintiff on his first day of work, there was an implied contract between the parties that the plaintiff's employment could be terminated only for cause. On May 17, 1985, the plaintiff's supervisors falsely accused the plaintiff of having falsified an expense request form. The defendant then terminated the plaintiff's employment without cause. The plaintiff made extensive efforts to seek other employment, but he was unable to earn an equivalent salary at another job. Because of the defendant's acts, the plaintiff experienced humiliation, embarrassment and damage to his reputation. The plaintiff suffered economic damages for the loss of wages between his discharge and the end of 1992 in the amount of $146,595, and noneconomic damages in the amount of $45,000. Additional facts will be discussed as necessary.

The trial concluded on January 10, 1992. The trial court issued its first memorandum of decision, reaching only the issue of liability, on January 25, 1993. The trial court issued a supplemental memorandum of decision on the issue of damages on April 15, 1993.

On appeal from the judgment of the trial court, the defendant makes five claims, four of which are based on the sufficiency of the evidence to support the trial court's findings. In particular, the defendant argues that there was insufficient evidence of: (1) an implied contract that the employment of the plaintiff could be terminated only for cause; (2) a breach of that contract; (3) defamation; and (4) damages. In addition, the defendant argues that the jurisdiction of the trial court expired before it decided the case, because the defendant had not knowingly and voluntarily waived the temporal limit on the trial court's jurisdiction that is contained in General Statutes § 51-183b.[1] We reject all of the defendant's claims.

I

We first address the defendant's claim that the jurisdiction of the trial court to decide the case had expired prior to the court's issuance of its two memoranda of decision. The defendant's claim is based on § 51-183b, which requires a trial court to decide a case within 120 days of the conclusion of trial, unless the parties waive the requirement. The defendant concedes that it declared its intent to waive the statutory requirement three times—at 120, 240 and 360 days after trial—and

[1] The trial court had received from the parties three successive waivers of the 120 day rule contained in General Statutes § 51-183b, which provides: "(Formerly Sec. 51-29). JUDGMENTS IN CIVIL ACTIONS. TIME LIMIT. Any judge of the superior court and any state trial referee who has the power to render judgment, who has commenced the trial of any civil cause, shall have power to continue such trial and shall render judgment not later than one hundred and twenty days from the completion date of the trial of such civil cause. The parties may waive the provisions of this section."

that both decisions were issued within 120 days of the third waiver. The defendant contends, however, that when it provided the third waiver on January 8, 1993, it understood, from information received from the clerk of the court, that the court would render a decision within ten days from the issuance of that waiver. The defendant further contends that "the clerk did not inform the parties that the decision which the court would be rendering would only address liability, nor that the court intended to continue the matter" for a subsequent decision as to damages. Had it known that the trial court would decide the case after January 18, 1993, and would do so in two separate memoranda, the defendant asserts, it would not have provided the third waiver. Therefore, the defendant argues, the third waiver was not knowing and voluntary. Because the waiver was not knowing and voluntary, the defendant concludes, it was invalid, leaving the trial court without jurisdiction to decide the case. We disagree.

There is no requirement that a waiver pursuant to § 51-183b be knowing and voluntary in the constitutional sense in order for the trial court to retain jurisdiction to decide the case. Although a "late judgment . . . implicates the trial court's power to continue to exercise jurisdiction over the parties before it"; *Waterman* v. *United Caribbean, Inc.*, 215 Conn. 688, 692, 577 A.2d 1047 (1990); we repeatedly have held that the statutory time limit may be waived merely by the parties' failure to object to the trial court's exercise of jurisdiction. Id., 692–93; *Gordon* v. *Feldman*, 164 Conn. 554, 556–57, 325 A.2d 247 (1973); *Borden* v. *Westport*, 112 Conn. 152, 154, 151 A. 512 (1930); *Cheshire Brass Co.* v. *Wilson*, 86 Conn. 551, 560, 86 A. 26 (1913). The standards for a waiver pursuant to § 51-183b are therefore wholly unlike those governing the waiver of a constitutional right. Cf. *Molinas* v. *Commissioner of Correction*, 231 Conn. 514, 523–24, 652 A.2d 481 (1994).

Moreover, even assuming that a waiver of the 120 day time limit would be invalid if secured by material misrepresentations or fraud, we could not conclude that the third waiver was so secured in this case. The defendant raised its claim about the third waiver directly to us, without first moving in the trial court to set aside the judgment. Cf. *Waterman* v. *United Caribbean, Inc.*, supra, 215 Conn. 690; *Neyland* v. *Board of Education*, 195 Conn. 174, 176–77 and n.4, 487 A.2d 181 (1985); *Sanchez* v. *Prestia*, 29 Conn. App. 157, 159, 612 A.2d 824, cert. denied, 224 Conn. 913, 617 A.2d 167 (1992); *Ippolito* v. *Ippolito*, 28 Conn. App. 745, 748–49, 612 A.2d 131, cert. denied, 224 Conn. 905, 615 A.2d 1047 (1992). As a result, the trial court made no evidentiary findings concerning the extent to which, or the circumstances in which, the parties had consented to extend the trial court's jurisdiction. We must review the defendant's claim, therefore, only on the basis of the pleadings and the evidence in the record on appeal. That record does not support the defendant's claim that any material misrepresentations were made.

The only item in the record relating to the defendant's third waiver of the 120 day limit is the waiver letter itself. That letter makes no reference to the defendant's supposed understanding that the trial court was going to decide the case within ten days. Indeed, the letter states on its face that the defendant "hereby waives the one hundred and twenty (120) day requirement . . . *to the extent of an additional one hundred and twenty (120) days in which to render judgment."* (Emphasis added.) Both the initial and the supplemental memoranda of decision were issued within that additional 120 day period. Moreover, nothing in the record suggests that there were any limits imposed on the trial court's discretion, within that period, to issue two separate memoranda of decision, one addressing lia-

bility and one addressing damages. There is similarly no allegation that the issuance of those separate memoranda prejudiced the defendant. In sum, we are unpersuaded that the trial court exceeded its jurisdiction.

## II

We next review the trial court's finding that there was an implied contract between the parties providing that the employment of the plaintiff could be terminated only for cause. We conclude that the trial court's finding was not clearly erroneous.

The following additional facts are relevant to this claim. Prior to November, 1982, the plaintiff was employed by the California Bionuclear Corporation as a radiochemist. In late July, 1982, the plaintiff came to Ridgefield at the defendant's invitation and expense, for job interviews with five of the defendant's employees. At several of the interviews, the plaintiff informed the defendant's employees that he was seeking "long-term" employment, and that he did not want to move his family from California unless the defendant could guarantee him job security. In response, one interviewer told the plaintiff that if the plaintiff did a good job, the defendant would "take care" of him. Another interviewer told the plaintiff that he hoped that the plaintiff would stay forever and that the plaintiff would have the opportunity to examine the company's employee manual to determine whether it provided the guarantees that he sought.[2] These oral representations were material to the plaintiff's decision, in late August, 1982,

---

[2] The plaintiff, whose native language was not English, testified as follows:

"Q. Now when you talked about the future [in the interview with Edward Barsemian, chief of the immunology laboratory], were you talking about the future of the company or your future with the company?

"A. My future, because I expressed to Barsemian that my objective is I am looking for a permanent job for a long-term employment. As a matter of fact, I said for a lifetime job. I don't want to stay with small compa-

to accept, by telephone, an offer to take a position with the defendant as a radiochemist.

On August 31, 1982, the defendant wrote to the plaintiff, stating that "[t]his letter confirms our offer to you for employment as Biochemist III at an initial salary of $30,000 per year." Although the letter from the defendant further represented that the defendant would provide the plaintiff with various fringe benefits, it did not state that the plaintiff's employment would be terminable only for cause. The letter also did not state, however, that it contained all the terms of the plaintiff's employment contract or that it superseded any prior or subsequent oral representations that

nies anymore. And Barsemian convinced me that is the best place you are looking for . . . .

\* \* \*

"Q. What went on in [the next] interview [with Jim Keirns, chief of the department of biochemistry]?

"A. In that interview, nothing was about chemistry but about in general perspective at Boehringer what would happen with me here, what is the terms of this employment I am seeking for. Was there a good future, what about the job security, how long do you expect, that is what my question, to stay at Boehringer. His answer was just do a good job, Boehringer will take care of you.

\* \* \*

"Q. And what went on during [the next] interview [with Stuart Rapp, personnel manager]?

"A. He was very nice, sensitive person. . . . I questioned Mr. Rapp how long you expect to stay in this company. He says, I hope you will stay forever.

"Q. You questioned Mr. Rapp?

"A. I questioned Mr. Rapp.

"Q. As to how long?

"A. How long I should stay in this company.

"Q. How long you should stay. And Mr. Rapp said?

"A. I hope you will stay forever. . . . And also Stuart promised me more details of the terms of our employment, we can provide your company's book and you can see and read and study that book to see if it is your favor or not. And he promised that book also.

"Q. What book was that?

"A. That is the company's policies and procedures."

might be made to the plaintiff. The plaintiff counter-signed the letter without adding anything thereto and returned it to the defendant.

The plaintiff moved to Connecticut in late October, 1982, and began work for the defendant on November 1. On that day, he was provided a copy of the defendant's employee manual, which he immediately proceeded to read. In a section titled, "The Right to Manage," the manual provided that "[t]he company recognizes its right and obligation to operate and manage its facilities. This includes the right to hire, *discharge for cause*, promote, demote, reclassify and assign work to employees." (Emphasis added.) In a section titled, "Management's 'Open Door,' " the manual further provided that "[the defendant] supports an 'open door' method of handling your ideas, areas of discontent, or job-related problems which you may feel cannot be worked out successfully with your immediate supervisor or manager. The Company's Open Door Policy provides you with access through the organization up to, and including, the office of the President and Chief Executive Officer when necessary. . . . You are encouraged to try to solve problems at the immediate supervisory or management level whenever possible. If, however, you feel it is a problem that cannot be brought to the attention of your immediate supervisor or manager, the problem should be brought directly to the attention of [the defendant's] Executive Management, including the President, when necessary." The provisions in the manual were material to the plaintiff's decision to continue to work for the defendant.

Sometime in 1984, the plaintiff was provided with an updated copy of the defendant's employee manual. Unlike the old manual, that document stated, on its cover, that "[t]his publication is distributed for general informational purposes only, and as such is subject to

change without notice." The new manual, in a section titled "General Principles of Personal Conduct," also provided for the first time that "[t]he following practices are unacceptable . . . 17. Falsifying any company record or report, or I.D. badge, or giving false information to anyone in the course of company business. . . . Every employee will be presumed to be familiar with these regulations. Violation of any is proper cause for disciplinary action, including dismissal. This list should not be considered as all inclusive." In a section titled "The Right to Manage," the new manual provided that "[t]he company recognizes its right and obligation to operate and manage its facilities. This includes the right to hire, discharge, promote, demote, reclassify and assign work to employees." As the trial court found, "[c]onspicuous by its absence was the theretofore requirement 'for cause.' " The new manual contained the same provisions relating to the "Management's 'Open Door' " policy as did the old manual.[3] The plaintiff did not believe that the new manual applied to him.

On the basis of the foregoing facts, the trial court rejected the plaintiff's claim that there had been an express contract between the parties that the plaintiff's employment could be terminated only for cause. Nevertheless, the trial court found that there had been an implied contract between the parties containing such an agreement. "The defendant, in its brief, argues that the words 'just do a good job and Boehringer will take care of you' and 'hope you will stay forever,' even if uttered to the plaintiff, do not amount to words or action or conduct which could, arguably, constitute

---

[3] The section relating to the open door policy was amended only so as to provide that problems that could not be brought to immediate supervisors "should be brought directly to [the defendant's] Executive Management, principally the Vice President, Personnel," rather than to the president.

some form of contract commitment. This court finds that when used as part of an employment interview involving a gainfully employed chemist who was seeking reassurance that a trans-continental relocation would be a worthwhile career move, such words could and did amount to a contractual commitment to the plaintiff that if he took the job he would not be terminated without just cause. . . .

"The court further finds that regardless of [its] value as an inducement to accept a position with the defendant, the Policies and Procedures Manual (1981 edition) was provided to the plaintiff as he commenced his employment and, consequently, he has the right to hold the defendant to the terms and conditions of employment set forth therein. . . .

"The evidence permits a finding that the defendant made an offer of employment to the plaintiff and during the course of that offer assured him that his employment would be governed by the Policies and Procedures Manual. The evidence is sufficient to permit a further finding that in reliance upon and in consideration for that offer, the plaintiff accepted the offer, terminated his existing employment, relocated his family across the country and bought a new home, the mortgage on which was, in part, subsidized by the defendant. That evidence is sufficient to permit a finding that the parties had an implied agreement that as long as he performed his job properly, the plaintiff would not be excused except for cause. . . . The plaintiff [also] was . . . entitled by the Manual, to access the Company's open door policy."

On appeal, the defendant challenges the trial court's conclusions on three grounds. First, the defendant argues that there was insufficient evidence that the alleged statements relating to job security in fact had been made by the defendants' employees. Second, the

defendant argues that, in light of the circumstances in which the statements were made and in which the 1981 employment manual was provided to the plaintiff, and in light of the specific language contained in those statements and that manual, the trial court could not reasonably have found that there was a contract between the parties that the plaintiff's employment could be terminated only for cause, or that the plaintiff would have the right to speak to a vice president of the company before any termination was finalized. Finally, the defendant argues that, as a matter of law, at the time of the termination, the plaintiff's employment was governed by the 1984 employment manual, which no longer contained any "for cause" language and cannot be read to support contractual recovery. We reject each of the defendant's arguments.

Because the plaintiff testified as to each of the alleged oral statements concerning his future job security and the trial court found that testimony credible, there was sufficient evidence for the court to find that the statements were in fact made. Although the defendant's witnesses denied having made the statements, the trial court was free to believe the testimony of the plaintiff and to disbelieve that of the defendant's witnesses. "It is the trial court which had an opportunity to observe the demeanor of the witnesses and parties; thus, it is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom. . . . A trier of fact is free to reject testimony even if it is uncontradicted . . . and is equally free to reject part of the testimony of a witness even if other parts have been found credible." (Citations omitted; internal quotation marks omitted.) *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank*, 230 Conn. 486, 507, 646 A.2d 1289 (1994).

Furthermore, there was sufficient evidence to support the trial court's findings that the implied contract

between the parties incorporated the terms of the oral statements and of the 1981 manual and that the contract was not modified by the 1984 manual. Our determination as to each of these evidentiary issues is informed by the general legal principles governing actions based on implied contracts of employment.

At the outset, we note that all employer-employee relationships not governed by express contracts involve some type of implied "contract" of employment. "There cannot be any serious dispute that there is a bargain of some kind; otherwise, the employee would not be working." 1 H. Perritt, Employee Dismissal Law and Practice (3d Ed. 1992) § 4.32, p. 326. To determine the contents of any particular implied contract of employment, the factual circumstances of the parties' relationship must be examined in light of legal rules governing unilateral contracts. See *Finley* v. *Aetna Life & Casualty Co.*, 5 Conn. App. 394, 409–10, 499 A.2d 64 (1985) (implied contract of employment is unilateral contract), rev'd on other grounds, 202 Conn. 190, 198, 520 A.2d 208 (1987); *Pine River State Bank* v. *Mettille*, 333 N.W.2d 622, 630–31 (Minn. 1983) (same).[4]

Pursuant to the legal principles governing such contracts, in order to find that an implied contract of employment incorporates specific representations orally made by the employer or contained in provisions in an employee manual, the trier of fact is required to find the following subordinate facts. Initially, the trier of fact is required to find that the employer's oral representations or issuance of a handbook to the employee was an "offer"—i.e., that it was a promise to the employee that, if the employee worked for the

---

[4] A unilateral contract is one in which the offeror invites acceptance of his promise not by a reciprocal promise, but by performance. Another way of stating the same point is that, in such a contract, there is no mutuality of obligation between the parties. See generally 1 E. Farnsworth, Contracts (1990) § 3.24; 1 H. Perritt, supra, § 4.37.

company, his or her employment would thereafter be governed by those oral or written statements, or both. If the oral representations and/or the handbook constitute an "offer," the trier of fact then is required to find that the employee accepted that offer. Subsequent oral representations or the issuance of subsequent handbooks must be evaluated by the same criteria. To be incorporated into the implied contract of employment, any such representation or handbook must constitute an offer to modify the preexisting terms of employment by substituting a new implied contract for the old. Furthermore, the proposed modifications, like the original offers, must be accepted. See 1 Restatement (Second), Contracts § 45 and illustration 8 (1981); 2 Restatement (Second), Contracts § 279 (1981);[5] see also 1 E. Farnsworth, Contracts (1990) § 3.24, p. 290.

Typically, an implied contract of employment does not limit the terminability of an employee's employment but merely includes terms specifying wages, working hours, job responsibilities and the like. Thus, "[a]s a general rule, contracts of permanent employment, or for an indefinite term, are terminable at will." *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 211 n.1, 520 A.2d 217 (1987).

---

[5] Section 45 of the Restatement (Second) of Contracts (1981) provides in relevant part: "Option Contract Created by Part Performance or Tender

"(1) Where an offer invites an offeree to accept by rendering a performance and does not invite a promissory acceptance, an option contract is created when the offeree tenders or begins the invited performance or tenders a beginning of it." Illustration 8 then gives the following example: "In January A, an employer, publishes a notice to his employees, promising a stated Christmas bonus to any employee who is continuously in A's employ from January to Christmas. B, an employee hired by the week, reads the notice and continues at work beyond the expiration of the current week. A is bound by an option contract, and if B is continuously in A's employ until Christmas a notice of revocation of the bonus is ineffective."

Section 279 of the Restatement (Second) of Contracts (1981) provides in relevant part: "Substituted Contract

"(1) A substituted contract is a contract that is itself accepted by the obligee in satisfaction of the obligor's existing duty."

Pursuant to traditional contract principles, however, the default rule of employment at will can be modified by the agreement of the parties. Id. "Accordingly, to prevail on the . . . count of his complaint [that] alleged the existence of an implied agreement between the parties, the plaintiff had the burden of proving by a fair preponderance of the evidence that [the employer] had agreed, either by words or action or conduct, to undertake [some] form of actual contract commitment to him under which he could not be terminated without just cause. [Id.], 212 n.2; *Therrien* v. *Safeguard Mfg. Co.*, [180 Conn. 91, 94–95, 429 A.2d 808 (1980)]. . . . Absent a statutory warranty or definitive contract language, the determination of what the parties intended to encompass in their contractual commitments is a question of the intention of the parties, and an inference of fact. As an inference of fact, it is not reversible [error] unless the [trier of fact] could not reasonably have arrived at the conclusion that it reached. *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.*, 183 Conn. 266, 274–75, 439 A.2d 314 (1981)." (Citations omitted; internal quotation marks omitted.) *Coelho* v. *Posi-Seal International, Inc.*, 208 Conn. 106, 112–13, 544 A.2d 170 (1988); see also *Finley* v. *Aetna Life & Casualty Co.*, 202 Conn. 190, 198, 520 A.2d 208 (1987) (whether employment manual becomes term of implied contract of employment is question of fact).

In this case, on the basis of the oral and written representations made to the plaintiff and the plaintiff's response to those representations, the trial court found that there were contractual agreements that: (1) the plaintiff's employment would be terminable only for cause; and (2) the plaintiff would have a right to speak to an executive officer of the company before any termination was finalized. In large part, the defendant's challenge to the trial court's findings is identical to the argument of the employer in *Coelho* v. *Posi-Seal Inter-*

*national, Inc.*, supra, 208 Conn. 112, that "all of the statements that the plaintiff testified had been made to him were, at most, merely expressions of [the defendant's employees'] expectations about the future, and were not manifestations of a present intention on the part of the company to undertake contractual obligations to the plaintiff under which he could not be terminated without just cause." Id.

We reject the defendant's argument here, just as we rejected it in *Coelho*. The trial court found that, in the circumstances of this case, the oral and written statements constituted promises to the plaintiff. The trial court further found that, by working for the defendant, the plaintiff accepted those promises. Although we might have made a different finding in the first instance, our role is not to retry the facts. "A finding of fact is clearly erroneous [only] when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Groton* v. *Yankee Gas Services Co.*, 224 Conn. 675, 691, 620 A.2d 771 (1993); *Crowell* v. *Danforth*, 222 Conn. 150, 156, 609 A.2d 654 (1992).

In light of the factual record in this case, we conclude that the trial court's finding was not clearly erroneous. The plaintiff testified that certain statements were made to him in the context of an employment interview in direct response to his inquiries about job security. One of those statements was that if the plaintiff did a good job, the defendant would take care of him. Another statement was that the plaintiff's employment would be governed by an employment manual. The offer letter sent to the plaintiff neither stated that it contained the entire terms of the employment offer nor disclaimed any guarantees of job security. The defendant's oral representations were material to the plain-

tiff's decision to move from California and accept employment with the defendant. The employee manual was provided to the plaintiff on the first day of work, and he immediately proceeded to read it to ensure that it was consistent with the defendant's representations. The manual explicitly qualified the defendant's right to discharge with the words "for cause." The manual also stated that every employee could speak to an executive officer about "job-related problems which [he or she] may feel cannot be worked out successfully with [his or her] immediate supervisor or manager." Finally, after reading the manual, the plaintiff continued to work for the defendant for several years. See generally *Coelho* v. *Posi-Seal International, Inc.*, supra, 208 Conn. 113–14, 118–19.[6]

We also conclude that the trial court's factual findings are not undermined as a matter of law by the issuance of a new manual in 1984. Pursuant to the principles of contract law discussed above, for the new manual to have modified the preexisting terms of employment, the plaintiff must have consented to that modification. The trial court did not find that there had been any such consent. The defendant argues, however, that the plaintiff consented as a matter of law to the provisions contained in the new manual, because he continued to work for the defendant even after the new manual had been distributed to him. In the circum-

---

[6] In *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, supra, 202 Conn. 214, we held that statements made by the school district to a teacher that she would be rehired were not sufficiently promissory to support contractual recovery. The school district's statements in that case were similar to the defendant's statements here. Id., 208–209. As we subsequently explained in *Coelho* v. *Posi-Seal International, Inc.*, supra, 208 Conn. 113, however, statements made to an employee must be examined in the circumstances in which they were expressed. Notwithstanding the broad language of *D'Ulisse-Cupo*, therefore, the question of whether statements are promissory should be considered as a question of fact, and factual conclusions will be reversed only when there is insufficient evidence to support them. See *Coelho* v. *Posi-Seal International, Inc.*, supra, 113–14.

stances of this case, we disagree that the mere distribution of the manual and the plaintiff's continued work necessarily demonstrated his consent to the proposed modification of the preexisting contract.

When an employer issues an employment manual that confers on an employee greater rights than he or she previously had, the employee's continued work for the employer thereafter ordinarily demonstrates that the employee has accepted that offer of new rights. See *Woolley* v. *Hoffman-La Roche, Inc.*, 99 N.J. 284, 298–99, 491 A.2d 1257, modified on other grounds, 101 N.J. 10, 499 A.2d 515 (1985); *Pine River State Bank* v. *Mettille*, supra, 333 N.W.2d 629–30; 1 H. Perritt, supra, § 4.37, pp. 338–43, 339 (collecting cases from other states; explaining that because "the most likely motive for an employer to make a promise of employment security to the workforce in general is that the promise will encourage employees to continue their employment," it is logical to view continued employment as acceptance of, and consideration for, such promise); see also *Coelho* v. *Posi-Seal International, Inc.*, supra, 208 Conn. 118–19 (employee's acceptance of implied contract can be demonstrated even if employee did not provide "separate consideration" for such promise); see also *Finley* v. *Aetna Life & Casualty Co.*, supra, 202 Conn. 198.

When an employer issues an employment manual that substantially interferes with an employee's legitimate expectations about the terms of employment, however, the employee's continued work after notice of those terms cannot be taken as conclusive evidence of the employee's consent to those terms. *Thompson* v. *Kings Entertainment Co.*, 653 F. Sup. 871, 875 (E.D. Va. 1987); *Bullock* v. *Automobile Club of Michigan*, 432 Mich. 472, 504–506, 444 N.W.2d 114 (1989) (opinion of Levin, J.), cert. denied, 493 U.S. 1072, 110 S. Ct. 1118, 107 L. Ed. 2d 1024 (1990); *In re Certified Ques-*

*tion, Bankey* v. *Storer Broadcasting Co.,* 432 Mich. 438, 459–61, 443 N.W.2d 112 (1989) (opinion of Levin, J.). If we were to accept the defendant's argument to the contrary, an employee whose preexisting contract provided that his or her employment could be terminated only for cause would have no way to insist on those contractual rights. The employee's only choices would be to resign or to continue working, either of which would result in the loss of the very right at issue—that is, the loss of the right to retain employment until terminated for cause. The fact that an employee continues working, therefore, may be relevant to determining whether he or she consented to the new contract, but cannot itself mandate a finding of consent. See *Pershern* v. *Fiatallis North America, Inc.,* 834 F.2d 136, 138 (8th Cir. 1987); *Bullock* v. *Automobile Club of Michigan,* supra, 504–506, (opinion of Levin, J.); *In re Certified Question, Bankey* v. *Storer Broadcasting Co.,* supra, 459–61 (opinion of Levin, J.).[7]

Because the trial court found that the terms contained in the 1984 manual would have substantially interfered with the plaintiff's legitimate expectations under his preexisting contract, and because there was no evidence other than the plaintiff's continued work for the defendant tending to show that the plaintiff had consented to the terms of the 1984 manual, we affirm the trial court's determination that the plaintiff's contract of employment continued to be governed by the 1981 manual and the previous oral representations made to him. In sum, the trial court's findings that the

---

[7] We need not decide in this case whether, when an employer issues an employment manual that changes the rights afforded to an employee but does not materially interfere with that employee's legitimate expectations about the terms of his or her employment, an employee who has notice of the new terms accepts those terms as a matter of law by continuing to work. Cf. *Ferrera* v. *Nielsen,* 799 P.2d 458, 460 (Colo. App. 1990); *Fleming* v. *Borden, Inc.,* 450 S.E.2d 589, 594–95 (S.C. 1994); *Trembly* v. *Mrs. Fields Cookies,* 884 P.2d 1306, 1312–13 (Utah App. 1994).

plaintiff's employment was terminable only for cause and that he had a right to invoke the "open door" procedure in the event of termination must be affirmed.

### III

We next review the defendant's challenge to the trial court's finding that the discharge constituted a breach of the implied contract. We conclude that this finding also was not clearly erroneous.

The following evidence is relevant to this claim. The plaintiff initially sent his resume to the defendant in 1982 in response to an advertisement in a trade magazine that represented that the defendant was seeking an employee to manage a radiochemistry laboratory that the defendant planned to construct. The plaintiff was hired for the purpose of managing this new laboratory.

When the plaintiff arrived to begin work in November, 1982, the radiochemistry laboratory was still under construction. For the following two years, while the laboratory construction proceeded, the plaintiff was assigned to synthesize various nonradioactive compounds.

On September 5, 1984, the plaintiff received his annual performance review. The plaintiff's supervisor characterized his performance as "[e]xcellent" and informed him that he was likely to be promoted from biochemist III to research associate, a managerial position, within six months.

Later that month, the plaintiff was permitted access for the first time to the newly constructed radiochemistry laboratory. He immediately expressed his concern to his supervisors that, as constructed, the new laboratory could not properly be used to synthesize radioactive compounds, because it did not contain the right kinds of plastic "hoods" for performance of the syn-

theses. According to the plaintiff, without the proper hoods, there was a danger that the laboratory workers would be exposed to radiation. Between October, 1984, and May, 1985, the plaintiff repeated this and other safety concerns about the new laboratory to his supervisors.[8] The supervisors rejected the plaintiff's concerns and instructed the plaintiff to find a way to perform the syntheses in the existing hoods. He was unable to do so. In February, 1985, the plaintiff was informed that, because of his failure to initiate work in the new laboratory, he no longer was being considered for a promotion to research associate.

In May, 1985, the defendant instructed the plaintiff to attend a training session in or near Boston, Massachusetts, to learn how to operate a piece of laboratory equipment that the defendant recently had purchased. The plaintiff believed that he was being sent to the training session as a form of punishment, because the new equipment was likely not to be operated by him, but by a lower level laboratory technician. Without prior authorization from the defendant, the plaintiff invited a coworker, who was employed by the defendant as a laboratory technician, also to travel to the training session with him.

Upon his return from the training session, the plaintiff completed a draft expense request form for expenses incurred on the trip. In the plaintiff's view, this expense request form was not designed to be an "official" request for reimbursement, but rather was supposed to list all expenses incurred, whether or not those expenses were business related. The plaintiff further believed that, according to company policy, he was required to include on his form not just his expenses, but also the expenses of his coworker, because his

---

[8] The plaintiff also requested that the defendant hire an additional laboratory aide, lock a door to the laboratory and purchase special "booties" that would be worn only in the lab.

coworker had a lower ranking position in the company and was traveling with him. In the plaintiff's understanding, the secretary to the chief of his department, who reviewed the form, would determine which expenses were compensable. Thereafter, a second "official" form was to be completed pursuant to the secretary's determinations, and that form was to be signed by the plaintiff and submitted to the defendant for reimbursement. In previous instances, the plaintiff had followed the procedure of submitting a draft "unofficial" form, receiving the secretary's corrections, and then submitting an "official" form and had never been informed that his method of completing the expense request forms was improper.

In conformance with his understanding of company policy, the plaintiff recorded on his draft expense form all expenses incurred either by him or by his coworker. He also recorded the daily mileage traveled, as reflected by the odometer of his coworker's car, without differentiating between business related mileage and mileage for personal excursions. When he submitted the initial form to the secretary of the department chief, the plaintiff orally informed her that the form included expenses for two individuals. He did not sign the form.

Approximately one week later, the secretary to the department chief returned the plaintiff's expense form to him. On the form were various handwritten notations about expenses that were either not compensable or needed supporting receipts.

Soon after the plaintiff received the secretary's annotations on his draft expense request form, his supervisor asked him to return a revised form directly to her as soon as it was completed. The plaintiff then prepared a revised "official" form pursuant to his understanding of the annotations on his "unofficial" form, signed the new form and returned it to his supervisor.

The next morning, the plaintiff was called into a meeting with his supervisor, the chief of his department and the company's personnel manager. At the meeting, the defendant's employees asked him to justify various items recorded on his expense request forms. The plaintiff explained his understanding of the company policy relating to the initial expense form. He further pointed out that he had filled out the second expense form in accordance with each of the instructions that he had received when the secretary had returned the form to him. The defendant's employees then accused the plaintiff of falsification of a company document in that he had recorded charges that he had not incurred or that were not compensable. The meeting concluded soon thereafter.

Approximately one hour after the meeting, the three employees of the defendant who had attended the meeting presented the plaintiff with a memorandum stating that his employment was being terminated, effective immediately, because he had falsified company documents. The defendant's employees instructed the plaintiff to collect his personal belongings and to vacate the premises immediately. They denied the plaintiff's request to meet with a vice president of the company to review the termination decision, and he was escorted out of the building. A copy of the memorandum provided to the plaintiff was placed in the plaintiff's personnel file.

On the basis of the foregoing evidence, the trial court found that "the evidence establishes that the true reason the plaintiff was discharged is the fact that he grew increasingly disenchanted with his employer's failure to provide him with the laboratory and the supervisory duties he expected to enjoy as the director of such a laboratory. The evidence demonstrates that he was denied his expected promotion . . . . As his memos documenting the Company's shortcomings in

lab design, purchasing, staffing and most adamantly, safety precautions, increased in number and critical comment, so did the intent of management to terminate his responsibilities."

The trial court concluded that, although the termination did not violate public policy,[9] it did violate the terms of the parties' implied contract of employment. "[The] denial to [the plaintiff of his right under the open door policy] is found to have been a direct consequence of the actions of the defendant's employees and a substantial breach of his implied contract . . . .

"[T]he plaintiff [also] enjoyed an implied contract of employment with the defendant which required some reasonable cause for his termination . . . . As previously noted, the court, while mindful that it should not lightly intervene to [interfere with] the exercise of managerial discretion . . . cannot and will not condone or overlook the fact that the true reason this plaintiff was terminated was due to his insistent badgering of his superiors to obtain his contractual rights as he perceived them. . . .

"The defendant admitted in its answer . . . that it 'terminated the plaintiff's employment' citing as a reason therefor the plaintiff's alleged '*having falsified Company documents.*' (Emphasis added.)

"The documents alleged to have been falsified were expense account reports generated by the plaintiff's aforementioned seminar in Massachusetts. . . . When taken in concert with the testimony about the extremely strained employer-employee relations, the claim of the defendant that the plaintiff intentionally falsified his expense report to obtain reimbursement of funds

---

[9] The trial court thus rejected the plaintiff's claim that his employment had been terminated because he had been a "whistleblower." Cf. *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980) (recognizing tort claim for discharge in violation of public policy).

to which he was not entitled loses credibility. It is clear from the evidence presented that the plaintiff was terminated as a result of his disputes with his supervisors . . . ."

The defendant contends that the trial court could not reasonably have found either: (1) that the plaintiff's employment had been terminated for a reason other than the falsification of documents; or (2) that the plaintiff had been denied access to the open door procedure.[10] We disagree.

Once again, we note that our role is not to retry the facts but only to determine whether there is sufficient evidence in the record to support the trial court's findings. Such evidence existed in this case.

On the basis of the documents admitted in evidence and the plaintiff's testimony, which the trial court deemed credible, it was reasonable for the trial court to find that inaccuracies contained in the plaintiff's expense forms, if any, resulted only from his innocent misunderstandings about company policy and not from acts of falsification. It also was reasonable for the trial

---

[10] The defendant also questions whether the trial court actually found that the plaintiff had been terminated for a reason other than his falsification of an expense request. In support of its argument, the defendant points to one sentence of the opinion, which reads: "It was the expense report turned in for reimbursement which is the basis for the plaintiff's discharge—not his persistence in identifying safety hazards." Although we agree that the sentence, read out of context, might be misleading, the sentences immediately preceding and following this quoted sentence, as well as the trial court's opinion as a whole, make clear that the trial court did not believe that the plaintiff had falsified an expense report and that it did not believe that the defendant had fired him as a result of the alleged falsification. Rather, the trial court found, the plaintiff had been fired because of disputes with his supervisors. In the context in which it was written, the quoted sentence was meant to convey only (1) that the expense report was the *alleged* basis for the employer's action, and (2) that the court did not believe that the supposed "whistleblowing" activities of the plaintiff, any more than the supposed falsification of an expense report, had been the real reason for the discharge.

court to find that the plaintiff's supervisors had been motivated to discharge him not because of the expense request forms but because of the disputes regarding his laboratory. Finally, it was reasonable for the trial court to find that, at the time when the plaintiff had been informed of his discharge, he had asked to speak to a vice president of the company and that his request had been denied.

Because the defendant does not allege that there was "just cause" for the discharge in the absence of actual falsification of documents by the plaintiff,[11] we affirm the trial court's determination in this case that there was no cause for the plaintiff's discharge.

## IV

We next review the trial court's conclusion that the defendant defamed the plaintiff. The trial court made the following factual findings in relation to this claim. "[H]aving found that the defendant falsely attributed the plaintiff's discharge to his falsifying of company

[11] The defendant has not claimed that, even if the plaintiff did not falsify documents, his supervisors had a good faith belief that he had committed such falsification when they discharged him and that such a good faith belief also constituted cause for dismissal. The defendant also has not argued that, even if the plaintiff did not falsify documents, his innocent or negligent inaccuracies on those documents themselves constituted cause for dismissal. Finally, the defendant has not argued that the plaintiff's "insistent badgering of his superiors" itself constituted cause for dismissal. See generally 1 H. Perritt, supra, §§ 4.46 through 4.51. We thus do not decide whether, if such claims had been made, the trial court properly could have found that there had been a breach of the implied contract between the parties. We also need not decide another legal question not raised by the parties— the question of whether it is the employer's burden to prove that there was cause for a dismissal or the employee's burden to prove the absence of cause for a dismissal. See id., § 4.52. In this case, the only evidence proffered as to a "cause" for dismissal was the plaintiff's alleged falsification, which the trial court found had been disproved by the preponderance of the evidence. Thus, even if the plaintiff had the ultimate burden to show the absence of cause for dismissal, the trial court's findings demonstrate that he carried that burden in the context of this case.

documents . . . the court finds that the plaintiff was defamed as to his professional reputation and that he is entitled to damages for the injury . . . . [T]here was sufficient publication of the allegation both among the several supervisors present at his discharge and by virtue of the written memorandum prepared at the time of his discharge and placed in his personnel file."

The defendant raises three challenges to the trial court's conclusion that the defendant's statements constituted actionable defamation. First, the defendant contends that the statements made were true. Second, the defendant contends that, even if the statements were not true, there was insufficient evidence of publication of those statements. Third, the defendant contends that even if there was sufficient evidence of publication, that publication was privileged.

The defendant has correctly identified the factual issues that are relevant to a finding of defamation. "To find that the defendants were liable for defamation . . . the [court] was required to find that the defendants published false statements that harmed the [plaintiff], and that the defendants were not privileged to do so." *Kelley* v. *Bonney*, 221 Conn. 549, 563, 606 A.2d 693 (1992). We are persuaded, however, that each of the necessary facts was adequately established and therefore reject the defendant's claims.

We already have affirmed the trial court's finding that the plaintiff did not falsify company documents. Thus, the defendant's first claim—that its statement about the plaintiff was true—is untenable.

The defendant's second claim—that there was no publication—is equally untenable. The trial court found that the statement about the plaintiff had been communicated among the plaintiff's supervisors and had been included in the plaintiff's personnel file. Although intracorporate communications once were considered

by many courts not to constitute "publication" of a defamatory statement, that view has been almost entirely abandoned, and we reject it here. See 3 Restatement (Second), Torts § 577 (1) and comment (i) (1977) ("The communication within the scope of his employment by one agent to another agent of the same principal is a publication not only by the first agent but also by the principal and this is true whether the principal is an individual, a partnership or a corporation."); W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 113, p. 798 ("There may be publication to any third person. . . . It may be made to the defendant's own agent, employee or officer, even where the defendant is a corporation."); R. Smolla, Law of Defamation (1994) § 15.02, and cases cited therein (finding publication on basis of communication among agents of employer in context of employment termination); see also *Battista* v. *United Illuminating Co.*, 10 Conn. App. 486, 489, 523 A.2d 1356, cert. denied, 204 Conn. 803, 525 A.2d 1352 (1987) (affirming finding of defamation where corporation accused plaintiff employee of theft in letter that was sent to plaintiff and three other agents of corporation); but see *Abrahams* v. *Young & Rubicam, Inc.*, 793 F. Sup. 404, 407 (D. Conn. 1992); *L. Cohen & Co.* v. *Dun & Bradstreet, Inc.*, 629 F. Sup. 1425, 1427 (D. Conn. 1986).

We also reject the defendant's third argument, which is that the publication was privileged. "There are two facets to the defense of privilege. The occasion must be one of privilege, and the privilege must not be abused. Whether the occasion is one of privilege is a question of law. . . . [W]hether the privilege was abused . . . depends upon whether there was malice in fact . . . in uttering and broadcasting the alleged defamatory matter." *Charles Parker Co.* v. *Silver City Crystal Co.*, 142 Conn. 605, 615, 116 A.2d 440 (1955); see also *Bleich* v. *Ortiz*, 196 Conn. 498, 504, 493 A.2d 236 (1985).

We agree with the defendant that communications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege. Such communications and documents are necessary to effectuate the interests of the employer in efficiently managing its business. See 3 Restatement (Second), Torts § 593, and § 596 and comment (d) (1977); W. Prosser & W. Keeton, supra, § 115 (3), pp. 828–29; R. Smolla, supra, § 15.07 [2] [a], and cases cited therein; see also *Bleich* v. *Ortiz*, supra, 196 Conn. 504 (privilege in acting to protect interest in property); *Miles* v. *Perry*, 11 Conn. App. 584, 594 n.8, 529 A.2d 199 (1987).

In this case, however, the trial court implicitly found that, as a matter of fact, the privilege had been abused because the defendant's agents had made the statement about the plaintiff with actual malice—that is, with knowledge of its falsity or reckless disregard as to its truth. See *Bleich* v. *Ortiz*, supra, 196 Conn. 504 (qualified privilege may be overcome on finding of malice); 4 Restatement (Second), Torts § 600 (1977) (qualified privilege fails if statement made with knowledge of falsity or reckless disregard as to truth). In his complaint, the plaintiff had pleaded that the statement had been made with knowledge of its falsity or reckless disregard as to its truth, and the defendant had denied that allegation. Moreover, in deciding the plaintiff's other claims, the trial court explicitly found that the defendant's agents had made the statement intentionally, that they had done so with an improper motive, and that they had failed to investigate or retract the statement even after the plaintiff notified them that the statement was false and requested further review.

In light of the pleadings, the trial court's findings on other issues and the trial court's ultimate determination on the defamation count, we are persuaded that

a finding of actual malice was implicit in the trial court's decision. The evidence in the record adequately supports such a finding, as the trial court reasonably could have inferred from the evidence that the defendant's agents published a false statement in order to effectuate the plaintiff's discharge, even though they doubted the statement's veracity. See *Woodcock* v. *Journal Publishing Co.*, 230 Conn. 525, 527, 646 A.2d 92 (1994) (in suit by public figure against media defendant, finding of actual malice permissible when there is "sufficient evidence to permit the [inference] that the defendant in fact entertained serious doubts as to the truth of his publication"). In any event, because the defendant failed to seek an articulation in the trial court as to whether the qualified privilege had been abused, it cannot now complain of a lack of an explicit finding on that issue. See *Mannweiler* v. *LaFlamme*, 232 Conn. 27, 31 and n.6, 653 A.2d 168 (1995); *Associated Catalog Merchandisers, Inc.* v. *Chagnon,* 210 Conn. 734, 747, 557 A.2d 525 (1989); *Southington* v. *State Board of Labor Relations*, 210 Conn. 549, 563, 556 A.2d 166 (1989); see also Practice Book § 4061.[12]

---

[12] Because the plaintiff's evidence satisfied the actual malice test described in *Woodcock* v. *Journal Publishing Co.*, supra, 230 Conn. 527, we need not decide whether, in a defamation action such as this one, a plaintiff could prove actual malice to defeat the qualified privilege on some lesser showing of recklessness. See *Bishop* v. *Kelly*, 206 Conn. 608, 614, 539 A.2d 108 (1988) (defining recklessness); cf. *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985) (first amendment does not invalidate award of damages in defamation action by nonpublic figure against nonmedia defendant involving issue of purely private concern). We also need not decide whether a plaintiff alleging defamation could overcome the qualified privilege without proving actual malice, by proving a lack of good faith on the part of the employer. Compare *Bleich* v. *Ortiz*, supra, 196 Conn. 504 (qualified privilege may be overcome on finding of bad faith or improper motive), *Charles Parker Co.* v. *Silver City Crystal Co.*, supra, 142 Conn. 615 (qualified privilege may be overcome on finding of bad faith), and *Miles* v. *Perry*, supra, 11 Conn. App. 594–95 and n.8, to 3 Restatement (Second), Torts § 600 (1977) (lack of good faith insufficient to defeat privilege; statement must be made with actual knowledge

## V

The defendant's final claim is that, in three respects, the damages award was improper. First, the defendant alleges that there was insufficient evidence that the defendant's actions caused any injury to the plaintiff. Second, the defendant alleges that there was insufficient evidence to support the award of lost wages for the period between the date of the plaintiff's trial testimony and the end of 1992. Third, the defendant alleges that there was insufficient evidence to support the award of noneconomic damages. We disagree with all three of the defendant's claims.

We first address the sufficiency of the evidence to support the award of economic damages for the defendant's breach of contract. The following facts are relevant to this claim. After the termination of his employment with the defendant, the plaintiff unsuccessfully sought employment as a chemist at more than thirty companies throughout the United States. The plaintiff therefore took a series of jobs outside his field of expertise, working as, inter alia, a security guard and as a quality control inspector for a plastic molding manufacturer. At the time of trial, the plaintiff was working as a quality control inspector for a computer equipment manufacturer. The plaintiff's salary at each of these new jobs was significantly lower than the salary that he had been earning from the defendant.

of falsity or reckless disregard as to truth), and R. Smolla, supra, § 15.07 [2] [b] (arguing that, because of importance of frankness in employee review process, privilege protecting such communications should be defeasible only upon proof of actual malice). Finally, we need not decide whether a plaintiff could overcome the qualified privilege without proving actual malice, by proving that the defamatory statement had been published to others not involved in the management or review of employees. See *Miles* v. *Perry*, supra, 595; see also 3 Restatement (Second), Torts §§ 603 through 605 (1977) (summarizing conditions in which privilege is defeated).

To determine the amount of economic damages from lost wages, the court engaged in the following analysis. First, it estimated what the plaintiff would have earned if he had remained employed by the defendant until the end of 1992. Next, it computed the sum of: (1) the wages the defendant in fact had earned at other jobs between the date of his termination and the date of his trial testimony in October, 1991, and (2) the wages the defendant probably would have earned between the date of his trial testimony and the end of 1992. It then awarded the plaintiff the difference between the first sum and the second, a total of $146,595. We see no impropriety in the trial court's finding as to economic damages.

"The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed. . . . It has traditionally been held that a party may recover general contract damages for any loss that may fairly and reasonably be considered [as] arising naturally, i.e., according to the usual course of things, from such breach of contract itself. . . . This court has consistently applied the general damage formula of *Hadley* v. *Baxendale* [9 Ex. 341, 354, 156 Eng. Rep. 145 (1854),] to the recovery of lost profits for breach of contract, and it is our rule that [u]nless they are too speculative and remote, prospective profits are allowable as an element of damage whenever their loss arises directly from and as a natural consequence of the breach." (Citations omitted; internal quotation marks omitted.) *West Haven Sound Development Corp.* v. *West Haven*, 201 Conn. 305, 319–20, 514 A.2d 734 (1986). Thus, "[t]he normal rule on an employment contract is that when the employee is prevented from fully performing because the employer wrongfully fires him, the employee can

recover the wages he would have earned under the contract, minus any wages which he has earned or could have earned elsewhere, and the burden of proof of the latter is on the employer. *Carter* v. *Bartek*, 142 Conn. 448, 451–52, 114 A.2d 923 [1955]." *Burns* v. *Gould*, 172 Conn. 210, 221, 374 A.2d 193 (1977).

In this case, the trial court made explicit findings about what the plaintiff would have earned from the defendant had he not been discharged, what he did earn from other sources after his discharge, and what he was likely to be able to earn between the date of trial and the end of 1992. Because each of the findings was based on reasonable inferences and estimates from the evidence presented, the findings must be affirmed. "Reasonable certainty of proof is all that is required, and mere uncertainty as to the amount of lost profits may be dispelled by the same degree of proof as is required in other civil actions, that is, the amount may be determined approximately upon reasonable inferences and estimates." (Internal quotation marks omitted.) *West Haven Sound Development Corp.* v. *West Haven*, supra, 201 Conn. 320.

We acknowledge that the Appellate Court recently has held that damages for future lost wages—i.e., wages for the period after the conclusion of trial—cannot be awarded in an action for breach of an employment contract. The Appellate Court reasoned that such damages, commonly known as "front pay," are an equitable, rather than a legal, remedy and were developed specifically as an alternative to reinstatement in actions for employment discrimination. See *Barry* v. *Posi-Seal International, Inc.*, 36 Conn. App. 1, 10–17, 647 A.2d 1031 (1994).

Whatever the origins of damages for future lost wages, however, we are persuaded that such damages can be awarded in actions for breach of an implied con-

tract of employment, as long as they are limited to a reasonable time and are supported by the evidence. Damages for future lost profits may be awarded in contract actions; see, e.g., *West Haven Sound Development Corp.* v. *West Haven*, supra, 201 Conn. 320; *Stern & Co.* v. *International Harvester Co.*, 148 Conn. 527, 533, 172 A.2d 614 (1961); *Kay Petroleum Corp.* v. *Piergrossi*, 137 Conn. 620, 624, 79 A.2d 829 (1951); and we can discern no difference between these types of damages and damages for future lost wages. See *Preston* v. *Phelps Dodge Copper Products Co.*, 35 Conn. App. 850, 859–60, 647 A.2d 364 (1994) (front pay damages *are* appropriate under normal principles of contract law); see also *Ohanian* v. *Avis Rent A Car System, Inc.*, 779 F.2d 101, 110 (2d Cir. 1985) (in action for breach of contract of employment, upholding award of front pay and the same damages computation used here); *Worrell* v. *Multipress, Inc.*, 45 Ohio St. 3d 241, 246–47, 543 N.E.2d 1277 (1989) (same); *Osterkamp* v. *Alkota Mfg., Inc.*, 332 N.W.2d 275, 279 (S.D. 1983) (same); *W. Pat Crow Forgings, Inc.* v. *Casarez*, 749 S.W.2d 192, 195 (Tex. App. 1988) (same). Moreover, in this case, the plaintiff's complaint included a request for equitable relief, and the plaintiff's trial brief specifically asked for reinstatement or, in the alternative, "that damages extend for a reasonable time period into the future, at least for a future period of time equal to the period from the time of the wrongful termination until the date of judgment." Thus, the defendant cannot complain of lack of notice of its potential liability.

Finally, we address the propriety of the award of noneconomic damages. The trial court found that, as a result of the defamation and the resulting discharge, "the plaintiff suffered not only loss of income, but also suffered emotional distress, embarrassment, anxiety and humiliation . . . ." To compensate the plaintiff,

the court awarded noneconomic damages in the amount of $45,000. Once again, we are persuaded that the award of damages must be upheld.

The trial court found that the defendant falsely had charged the plaintiff with improper conduct and lack of integrity in the performance of his professional duties and that the purpose of the defamatory statement had been to effectuate the plaintiff's discharge. The defamation, therefore, amounted to defamation per se. *Moriarty* v. *Lippe*, 162 Conn. 371, 384, 294 A.2d 326 (1972); *Proto* v. *Bridgeport Herald Corp.*, 136 Conn. 557, 566, 72 A.2d 820 (1950); *Battista* v. *United Illuminating Co.*, supra, 10 Conn. App. 491–92. "When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation. He is required neither to plead nor to prove it." *Urban* v. *Hartford Gas Co.*, 139 Conn. 301, 308, 93 A.2d 292 (1952). The plaintiff is "entitled to recover, as general damages, for the injury to his reputation and for the humiliation and mental suffering which the libel caused him." *Proto* v. *Bridgeport Herald Corp.*, supra, 571. In light of these authorities, we are persuaded that the award of noneconomic damages was within the discretion of the trial court. See also *Miles* v. *Perry*, supra, 11 Conn. App. 602–603; *Battista* v. *United Illuminating Co.*, supra, 493–94.

The judgment of the trial court is affirmed.

In this opinion the other justices concurred.