[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON PLAINTIFF'S APPLICATION FOR A TEMPORARY INJUNCTION
Plaintiff has brought this action to prohibit the defendant from taking any action to enforce a non-compete agreement executed by the parties in October, 1994. The agreement provides, inter alia, that the plaintiff (hereinafter also "Artman") is prohibited from competing with the defendant (hereinafter also "OTSE") for a period of two years following the end of her employment with OTSE which occurred in May 1999.
This matter was tried before this Court on March 3, 2000 and April 4, 2000. The parties submitted both pre-trial and post-trial briefs which the Court has read. The Court has also reviewed the exhibits, including the depositions of Artman and David Willoughby (hereinafter also "Willoughby") who was president of Mail Processing Systems, Inc. (MPS), president of Output Technologies Eastern Region (OTE) and senior vice president of Output Technologies Solutions Eastern Region, Inc. (OTSE). The defendant, OTSE, is the successor to MPS and OTE. The Court has further reviewed the transcripts of the trial itself. In addition, much of the Court's decision is based upon the credibility of the witnesses which is based upon their demeanor on the witness stand, the manner in which they responded to questions, the consistency or inconsistency of their testimony, their recollection of events and their interest, or lack thereof, in the outcome of the case.
 ISSUES
The parties, by written stipulation dated February 16, 2000, have agreed that: CT Page 5931
 "The sole issue for the Court to decide regarding the enforceability of the two-year non-competition covenant in the 1994 Confidentiality, Nondisclosure and Non-Competition Agreement ("Agreement") between Artman and Output is whether the Agreement was supported by adequate consideration."
From the totality of the evidence, the Court finds as follows:
1. By letter of October 18, 1991, (Plaintiff's Exhibit 2), Willoughby, as president of MPS, advised Artman as to his feeling about her compensation package if she were to become an employee. It describes salary, automobile allowance, profit sharing, vacation, and medical benefits. It also states:
 "Additionally, the position warrants participation in the 1995 Performance Bonus Pool at the rate of three percent, given satisfactory performance. The 1995 Bonus Pool is now estimated to be approximately $5,800,000. There is no assurance that we will make our 1995 Plan, but senior management feels confident that we can."
It should be noted that 3% of $5,800,000.00 is $174,000.00.
2. By letter of October 28, 1991 (Plaintiff's Exhibit 1) (hereinafter also the "offer letter"), Willoughby offered Artman the position of Chief Information Officer, which she accepted. The content of the letter is as follows:
"Dear Karen:
 I am pleased to offer you the position of Chief Information Officer of Mail Processing Systems, Inc. The position reports to me. Its principal objectives, reporting relationships and principal responsibilities are contained in the attached Position Description.
 The position carries an annual salary of $85,000; participation in the annual Profit Sharing Plan; and receives an automobile allowance under the standard MPS plan. Additionally, I will include you as a participant in the 1995 Performance Bonus Pool given successful fulfillment of the responsibilities of theCT Page 5932 position through 1992. My current judgment is that you should participate at a level equivalent to three percent (3%) of 1995 EBIT; but I have the prerogative to increase or decrease any participants level based upon contribution to MPS's growth.
 Karen, I believe you can make a significant contribution to the growth and success of MPS. MPS should offer you an exciting challenging opportunity to utilize your experience and skills in a dynamic environment. I look forward to working with you.
Very truly yours,
 David W. Willoughby President" (emphasis added.)
3. The offer letter is sufficiently definite to constitute an offer to participate in the Performance Bonus Pool. Willoughby testified (Deposition Tr. pages 94-95) that "the letter extends participation in the pool to Karen." It is conditional upon her successful fulfillment of the responsibilities of her position through 1992. Artman, therefore, had a right to rely on her participation if she successfully fulfilled her responsibilities. This was an incentive offered to her as part of the employment offer as well as an incentive to perform her duties successfully. Willoughby testified that she in fact successfully fulfilled her responsibilities through 1992. (Dep. Tr. page 95). "Karen certainly contributed greatly to the success of the company." Willoughby (T.T. April 4, 2000 page 18).
4. The offer was sufficiently definite as to the percentage she would receive. Taking the October 28, 1991 and the October 18, 1991 letters together, there is no question that Artman would participate at a rate of three (3%) percent. Admittedly, the level of participation could increase or decrease at Willoughby's discretion based upon his evaluation of Artman's contribution to MPS's growth. However, Willoughby had to exercise his discretion fairly in order to comply with the implied covenant of good faith and fair dealing that attaches to every contract. Put another way, based upon Willoughby's positive evaluation of Artman which is no doubt supported by her record of employment, OTSE would have been liable to Artman for violation of the implied covenant of good faith and fair dealing if she had not been paid the bonuses she received,
The language of Meaney v. Connecticut Hospital Assn, Inc., 250 Conn. 500,521, 522 (August 31, 1999), is instructive. Assuming this offer was an CT Page 5933 indefinite contractual commitment, which this Court does not believe it was, the Court in Meaney addressed this issue by observing that ". . . courts have been increasingly willing to flesh out the intended meaning of indefinite contract language by recourse to trade, custom, standard usage and past dealings . . . As long as there is some objective benchmark against which to measure the scope of the parties' contractual undertaking, or the reasonableness of a party's reliance, it may no longer be necessary to resort to the law of restitution to provide a remedy for the enforcement of indefinite terms contained therein."Meaney was about restitution of a bonus, but this language is applicable to contracts. This Court concludes that there is a benchmark. It is the reference to the three (3%) percent. As to Artman's reasonableness of reliance on this offer, she certainly had a right to rely to the extent that if she performed successfully her duties through 1992 and that Willoughby was complying with the covenant of good faith and fair dealing, she could expect at least $174,000.00 and possibly more. Further, Artman testified that this offer to participate in the bonus pool was an important inducement to her to take the job with MPS. See, T.T, 3/3/2000 page 19. Artman's reliance on these promises made in the offer letter was reasonable.
5. At no time did the issue of a non-compete agreement arise at or about the time of the offer letter. Defendant claims that Artman is or was subject to the Performance Bonus Administration Agreement (Defendant's Exhibit G) between DST Systems, Inc., the company purchasing MPS and MPS and David W. Willoughby individually, dated May 16, 1991. This argument is unavailing because not only was Artman not a party to the agreement, she had no knowledge of the agreement at the time of the offer letter and acceptance. Artman did not even become aware of this agreement until February 2000 so she could hardly be bound by it. The Court rejects defendant's argument that it was incorporated by reference into the offer letter. It is not mentioned in that letter. The Court further rejects the argument that she is as much subject to this agreement of May 16, 1991 as she was to the benefits of employment such as health benefits, etc. This argument overlooks the fact that the letter of October 18, 1991 did specify medical and dental insurance, etc., and an automobile allowance. The existence, or requirement, of a non-compete agreement is certainly a much more important subject or condition to be reviewed by the employee than the details of health insurance.
6. Clearly Artman was not asked to sign a non-compete or confidentiality agreement as part of the initial terms and conditions of her employment of October 1991. Not only was she unaware of the Performance Bonus Administration Agreement, but the subject of the non-compete or confidentiality agreement never came up. Willoughby CT Page 5934 testified that the reason that she was not asked to sign is "I suppose it was just lack of attention to detail on my part. I never required any of the people that I hired to sign those things. I felt that they could work for me as long as they wanted to and if we weren't a good enough company, offering them a career that they thought was challenging and exciting and something they wanted to be a part of, that they could move on. . . . I think that noncompete should be employed only in among the most I would say special situations . . . it would not have occurred to me to have a non-compete signed." Willoughby deposition pages 100-101.
7. It is well settled law in Connecticut that continued employment is not consideration for a covenant not to compete entered into after the beginning of the employment. The case cited by the defendant, Van DyckPrinting Co. v. DiNicola, 43 Conn. Sup. 191 (1993) is not applicable to the case at bar. In Van Dyck the parties had not concluded the terms of the employment contract. However, wording in Van Dyck is instructive in that it says: "This case does not resemble the situation presented inNational Safe Northeast, Inc. v. Smith, Superior Court, Superior Court Judicial District of Hartford-New Britain at Hartford, Docket No. 304189 (December 31, 1985), in which an employee who had been working for one year was asked to sign a covenant not to compete as a condition of continued employment, a circumstance found to entail no new consideration for the new obligation. Also see Dick v. Dick, 167 Conn. 210
(1974), which hold that continued employment is not additional consideration and that past consideration cannot support the imposition of a new obligation. Also see Kristin Norton v. Commercial CreditCorporation, et al, CV 98-0578441, Superior Court Judicial District of Hartford at Hartford, October 6, 1998 (Rittenband, J.) citingThermoglaze, Inc. v. Morning Side Gardens Co., 23 Conn. App. 741, 745,583 A.2d 1331 (1991) and Torosyan v. Boehringr IngelheimPharmaceuticals, Inc., 234 Conn. 1, 18, 662 A.2d 89 (1995)
8. As for defendant's argument that Artman received enhanced compensation; i.e. $260,000.00 instead of $174,000.00 which was additional consideration for the signing of the non-compete agreement, suffice it to say that the amount described in the offer letter was an amount that could have been higher than the three (3%) percent.
9. Accordingly, the Court finds that there was no new consideration, and, therefore, no consideration for Artman signing the non-compete agreement. The promises as to the bonus pool contained in the offer letter of October 28, 1991, was not consideration for the execution of a noncompete agreement, and, therefore, there was no consideration to Artman for signing the non-compete agreement. The answer to the question raised in the stipulation of February 16, 2000 is that the Agreement was not supported by adequate consideration. CT Page 5935
The Court considers the other issues raised by the parties to be irrelevant to this decision.
10. As for the arguments made by the defendant claiming that injunctive relief is not appropriate, the Court is not persuaded. Defendant has had access to this issue in this case, Artman's fear of litigation against her is based upon objective evidence that the defendant has stated to Artman that it will enforce the non-compete agreement.
On Count I of the complaint, a declaratory judgment is hereby issued in favor of the plaintiff. The non-compete agreement is unenforceable. As for Count II, the Court finds that litigation by the defendant against the plaintiff to enforce the non-compete agreement will cause irreparable harm to the plaintiff, and she does not have an adequate remedy at law. Accordingly, judgment is entered for the plaintiff and a temporary injunction is hereby issued enjoining the defendant from initiating litigation to enforce the subject non-compete agreement. Judgment is also entered for the plaintiff on the counterclaim.
Rittenband, J.T.R.