[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case requires a determination as to whether conditions of the plaintiffs' employment were breached and, if so, what damages resulted therefrom. After the court dismissed the first and third counts of the plaintiffs' revised complaint,[1] the trial proceeded on the second count (for Sledge) and the fourth count (for Crisafi). Both counts contain similar allegations, namely: that the plaintiff Sledge and the plaintiff Crisafi were employees of the defendant as manager and assistant manager respectively of the parking garage; that during the summer of 1990 the plaintiffs became aware of a discrepancy in wages between their salaries and the salaries of other managers and assistant managers in the defendant's organization and that newcomers were being hired at salaries higher than theirs; that in 1982, the defendant, by virtue of its Employee Handbook (for full-time employees) expressly or impliedly promised the plaintiffs that each of them as part of his continued employment would receive an annual wage and benefit review, with wages and benefits to be set and/or adjusted according to rates and benefits for comparable work as well as individual performance and productivity; that the defendant failed to engage in meaningful and good faith reviews of the plaintiffs' salaries that, considered each plaintiff's productivity and the rates and benefits for comparable management work and responsibilities. The defendant admitted each plaintiff's employment but denied the remaining allegations of both counts at issue. CT Page 5316-KKK
 I.
From the evidence produced including reasonably drawn inferences, the court finds that the following facts were established. The plaintiff Sledge attended school only until the eighth grade in Louisiana. He worked for the defendant twenty-two years starting as a cashier in the garage when it opened in 1972 and becoming manager in 1980. In May, 1993, Sledge retired in ill-health and with the knowledge that his position would be eliminated. The plaintiff Crisafi started to work for the defendant in 1975 and stopped February, 1991 when he was laid off. In 1981, he became the assistant manager of in the garage.
Crisafi received copies of the defendant's Employee Handbook (Full Time Employees) at the Personnel Office in 1982. He brought them to the garage where they were shared with Sledge. Both plaintiffs read and testified that they relied on the Handbook. Material to this case is § VII of the Handbook entitled "Performance Evaluation and Annual Review" Section VII reads as follows:
 A. It is the policy of the coliseum to conduct a performance evaluation with respect to each employee. This is typically done between June and August of each year and is conducted by the Department head.
 B. In addition to the performance evaluation, the coliseum will conduct a review once a year of all wages and benefits received by employees. This is generally done with a view toward a July 1 implementation.
 Many factors are taken into account in this review including such things as rates and benefits paid for comparable work, changes in the cost of living, individual performances and productivity, the general financial condition of the coliseum and any applicable budgetary constraints.
The defendant is a public recreational facility authority established by the City of New Haven pursuant to §§ 7-130a to7-130n of the General Statutes (Rev. to 1966). The ordinance by which the defendant was founded, the defendant's certificate of CT Page 5316-LLL incorporation and the reports, including the budget and list of employees that the defendant is required to file annually with the city are set forth in §§ 19-21 to 19.25 of the New Haven code.[2] The preparation of the annual budget including the salaries of staff members as well as the day-to-day operation of the coliseum are, however, primarily the responsibility of James Perillo, the defendant's executive director pursuant to his contract of employment.
Despite the language of § VII of the Employee Handbook, the defendant never engaged in formal performance evaluations. The annual review of salaries was limited to the following procedure: James Perillo would review the existing salaries in department with each departmental manager. He would tell each departmental manager what he wanted to pay and then he would tell each departmental manager to submit the salary figures as part of the manager's proposed budget. At a later point in time, Perillo prepared an evaluation form for Employees. Moreover the use made of the Employee Handbook appeared to be questionable. Davin Olsen, the defendant's former Director of Operations said that when he came to work for the defendant he was given a copy. But that he never read and never referred to it. Henry Criscuolo, Charles Mascola and Mae Ola Riddick, three of the defendant's commissioners in the late 1980's and early 1990's, who comprised the personnel committee were ignorant of the handbook's existence.
As manager and assistant manager of the garage, Sledge and Crisafi divided their duties. Sledge was in charge of maintenance and cleaning while Crisafi became the memo-writer and the bookkeeper. Crisafi took orders for the monthly coupon books sold to parking customers at the garage, wrote daily reports including reports of events, prepared budget proposals and distributed tickets to the cashiers that were stationed at the entrances to the garage. In the written work, Crisafi had the assistance of Albert Rhone a North Haven Police Officer who had preceded him as assistant garage manager and who, at the request of Sledge and Crisafi, was hired by James Perillo as night relief supervisor to give them some time off. In the written job descriptions that were sent to James Perillo on August 7, 1985, Crisafi wrote his own while Sledge's job description was prepared and typed by Albert Rhone. A subsequent job description for Sledge prepared in 1990 was on a form provided by the Executive Director's Office.
In Sledge's position as manager, he supervised two full time CT Page 5316-MMM employees and 10-12 part-time workers who were welfare recipients being employed under a work fare program to clean the garage. Also when scheduled events occurred at the coliseum, Sledge was in charge of up to 11 or 12 part-time cashiers and floor workers depending on the number of expected patrons.
After the money that had been paid for parking was counted, Sledge had to take it to the bank drop across the street. The only person who accompanied him was one of the part-time workers who had been hired as a security guard.
Snow and rain were Sledge's nemeses and a constant source of friction between him and Perillo. This situation was typified by an exchange of memos on March 1, 1987. Perillo questioned why the drains were clogged and the portable pumps were not set up and operating on the day of an event after continuous rain for eight hours. Sledge, in reply, stated that the drains were not clogged but, because of incorrect repairs, could not handle the volume of water. With respect to the pumps, Sledge reported that they had been borrowed by the Operations Department and had not been returned to the garage. These problems persisted and were present in 1990 and 1991 as evidenced by memos sent between Perillo and Vincent Wiel, the defendant's former operations manager who Perillo had appointed to take charge of most of Sledge's duties.
The plaintiffs established that they were paid less and that in most instances their increments were smaller than other employees who held positions of manager or assistant manager in other departments of the coliseum. In 1990, for example, Clyde Sledge earned $26,000.00 and Mark Crisafi $20,500.00. In the same year Joseph Goodwin the box office manager had a salary of $40,000.00; Grace Proto, Goodwin's assistant earned $26,000.00; Vincent Wiel, operations manager, received $36,000.00; Davin Olsen, director of security, $44,000.00 and Gary DeLeone, concessions manager, $44,750.00. Another claim of the plaintiffs was that they worked longer hours than managerial help in other departments because they had to ready the garage prior to events especially if here was rain or snow and the time it took to clear the garage of patrons' cars after an event ended. The plaintiffs' salaries were based on forty hour weeks with no overtime. Proposals whereby overtime pay or compensatory time would be allowed after 40 hours for all managers were rejected by James Perillo.
According to the plaintiffs, things went from bad to worse. CT Page 5316-NNN There had always been discrepancies between the number of cars parked in the garage for an event and the amount of money collected. A person from Perillo's office, Gigi Mauro, was assigned to monitor the situation. On September 10 and October 2, 1990, the plaintiffs purporting to act for the part-time cashiers hired for events sent a memo to Perillo and to James Thurber, the defendant's comptroller, in which they wrote that until a proper car counting system was installed, the cashiers felt "it would be best if they were to remain on Traffic Control for incoming and outgoing traffic and not be assigned to collect event money."
Not being satisfied with any response from James Perillo, the plaintiffs took their complaints to members of the defendant's governing commission. A personnel committee composed of Commissioners Henry Criscuolo, Charles Mascola and Mae Ola Riddick looked into the matter, spoke with the plaintiffs and separately with James Perillo. The personnel committee sympathized with the plaintiffs regarding their complaints of lack of meaningful employee reviews, inadequate salaries and increments, long hours and lack of proper equipment. In the end, however, neither the personnel committee nor the full commission took any meaningful action. In 1990 when Commissioner Riddick said to Sledge "we got you guys a big raise," he answered that it was not much of a raise when you have a wife and five kids. Sledge's increase in salary in 1990 amounted to $1,447.00.
In terms of comparable employment Crisafi compared himself to the box office assistant manager (Grace Proto) and the concessions assistant manager (unfilled since 1988). Sledge said his work was comparable to that of the Director of Security (Davin Olsen) or the Concessions Manager (Gary DeLeone). James Perillo disagreed. In 1987 or 1988 he had to make the Operations Manager, Vincent Wiel, Sledge's superior for the maintenance of the garage leaving Sledge in charge of traffic flow only. In 1989, GiGi Mauro was assigned to the garage in a supervisory position but principally concerned with the amount of cars parked and facilitating their departures after an event. Perillo was of the opinion that Sledge and Crisafi were uncooperative and that he had to check constantly to see if his directives were being carried out. Referring to Sledge's two comparables, Perillo pointed out that Olsen had a college degree and a certificate for courses in security while DeLeone dealt with a varied inventory and handled millions of dollars. He described both Olsen and DeLeone as highly motivated and efficient. CT Page 5316-OOO
Business at the coliseum declined. Effective February 6, 1991, Perillo reduced the salaries of all managerial help, including his own, except Sledge who continued to make $26,000.00. As of February 6, 1991, the annual salaries of Crisafi's two comparables were reduced to $22,750.00 (Grace Proto) and $26,000.00 (Peter Pietruszka) while his own annual salary would have been $19,201.00. Sledge's comparables earned annually $41,580.00 (Davin Olsen) and $42,289.00 (Gary DeLeone) while he continued at $26,000.00.
The disputes between the plaintiffs and James Perillo also involved the person who was to perform the yearly evaluation. The plaintiffs' version of § VII of the Employee Handbook was that Perillo or someone from his office had the obligation. Perillo claimed that he had asked department heads to make annual reviews of their subordinates and pointed to the minutes of the staff meeting held on May 28, 1986. Those minutes contain a request to all department heads to evaluate every employee in their departments by the following criteria: hourly rate of pay, hours worked per week, whether the position should be full or part-time and whether it should be salaried or be paid on an hourly basis, and whether the person in the position was qualified, unqualified or overqualified. His contention is that whereas he was to evaluate a department head, the department head had the duty to evaluate his subordinates.
Some further findings have also been made. They appear in the next section of this memorandum.
 II.
The plaintiffs' burdens of proof in this case can be summarized as follows: the plaintiffs must establish that the language, heretofore quoted, from § VII of the Employee Handbook was part of a contract between them and their employer; the plaintiffs must establish that this contract was breached; and the plaintiffs must establish that as the result of such breach each of them sustained damages in the nature of lower salaries and diminished annual increments.
 A.
Aside from whatever rights § VII may have given them, both plaintiffs were at-will[3] employees. Although wrongful CT Page 5316-PPP termination of at-will employment, the subject of many Connecticut cases is not an issue here, the language in these decisions is instructive.
Recently our Supreme Court commented that all employer-employee relationships not governed by an express contract must involve some type of implied contract of employment. Otherwise the employee would not be working. Torosyan v. Boehringer Ingelheim Pharmaceuticals,Inc., 234 Conn. 1, 13 (1995). Whether an employment manual becomes a term of an implied contract of employment becomes a question of fact. Id. at 15, Finley v. Aetna Life Casualty Co., 202 Conn. 190,199 (1987).
The Employee Handbook was at the Personnel Office seemingly available to all full time employees. Section VII refers expressly to each employee in its statement of policy concerning annual performance, salary and benefit reviews. Consequently impediments concerning for which class of employees a manual was intended and to which class it was distributed that prevented a manual from achieving contract status in Carbone v. AtlanticRichfield Co., 204 Conn. 460, 472 (1987) and in District Court opinions applying Connecticut law, e.g. Grich v. TextronLycoming, 822 F. Sup. 66, 71 (D.Conn. 1993); Owens v. AmericanNational Red Cross, 673 F. Sup. 1156, 1165 (D.Conn. 1987) andSivell v. Conwed Corporation, 666 F. Sup. 23, 27 (D.Conn. 1987) are absent in this case.
Knowledge and reliance on the Handbook by the plaintiffs was established. Therefore, the disinclination to read or refer to by Davin Olsen and perhaps other managerial personnel becomes of little importance as does the commissioners' lack of knowledge that it existed. Unquestionably § VII conferred greater rights on Sledge and Crisafi then they previously had. The effect of a beneficial condition having been added to the terms of employment is discussed at length in Torosyan v. Boehringer-IngelheimPharmaceuticals, Inc. supra.
 When an employer issues an employment manual that confers on an employee greater rights than he or she previously had, the employee's continued work for the employer thereafter ordinarily demonstrates that the employee has accepted the offer of new rights.
234 Conn. at 18. Viewing the employee's continuance of employment as consideration for a newly created right changed somewhat our CT Page 5316-QQQ previous law that the employee's acceptance could be shown even if the employee did not provide a separate consideration. Coelhov. Posi-Seal International, Inc., 208 Conn. 106, 118-19 (1988).
In the offer-plus-acceptance-equals-contract analogy ofTorosyan, supra, the court readily concludes that § VII of the Employees Handbook gave to the plaintiffs the right to have an annual performance, salary, and benefit review. This conclusion does not, of course, answer the question of who, in the case of Crisafi, was to perform such a review. On cross examination, Sledge admitted that one of his duties was to evaluate personnel. His second written job description, entered as a plaintiffs' exhibit, lists among his major, on-going responsibilities "Supervises, monitors and evaluates all garage-related personnel" with the term "O.K." written on the side. At the trial, as mentioned, there was testimony as well as documentary evidence that Perillo had asked the managers and directors to prepare annual reviews. Moreover, assigning responsibility for Crisafi's performance evaluation to Sledge is the more sensible interpretation of what the defendant intended in making its offer embodied in § VII of the Employee Manual. See Barnard v. Barnard, 214 Conn. 99, 110 (1990) (in the ascertainment of intent circumstances surrounding the making of the contract are to be considered and words are to be given their common meaning).
 B.
As readily as § VII was found to form part of the implied contract of employment, the court concludes with respect to both plaintiffs that the contract was breached. Sledge, according to § VII, was entitled to an annual performance evaluation by Perillo, the executive director, the person to whom he reported. The court has found that Sledge was to conduct Crisafi's performance evaluation but, in this capacity, Sledge would be acting as the agent of the defendant. Both plaintiffs were not given any meaningful annual review of wages and benefits.
The conclusion that the evaluation and review provisions of the employment agreement were breached is supported by regular contractual principles as well as by application of the implied covenant of good faith fair dealing discussed in Magnan v.Anaconda Industries. Inc., 193 Conn. 558, 565 (1984) and Carbonev. Atlantic Richfield Co., 204 Conn. 460, 470 (1987). In Magnan,supra at 569, 571, our Supreme Court noted with approval that CT Page 5316-RRR Massachusetts courts had applied the covenant to situations where a termination of employment was not based on motives that contravened public policy[4] but nevertheless had the effect of depriving an employee of benefits attributable to past services.[5] Part of each plaintiff's claim for damages in this case is additional compensation for work done in the past.Carbone, supra also involves a termination of employment. The description of the purpose of the implied covenant of good faith and fair dealing is, however, cast in significantly broader terms. "[T]he purpose of such an implied covenant is to fulfill the reasonable expectations of the parties." 204 Conn. at 470.
 C.
To be entitled to damages, the plaintiffs had to establish a causal relationship between the lack of performance evaluations and wage and benefit reviews and the financial losses they claim to have suffered. See Aspiazu v. Orgera, 205 Conn. 623, 630
(1987). "It is hornbook law that to be entitled to damages in contract[6] a plaintiff must establish a causal relationship between the breach and the damages flowing from that breach."Calig v. Schrank, 179 Conn. 283. 286 (1979).
The issue of causation presents the court with another question of fact. Phinney v. Casale, 40 Conn. App. 495, 499
(1996). A causal connection must rest upon more than surmise or conjecture. The court, as trier, is concerned not with possibilities but with reasonable probabilities. Aspiazu v.Orgera, supra; Calig v. Schrank, supra. The necessary connection can be proved through circumstantial as well as direct evidence.Phinney v. Casale, supra; Commercial Union Ins. Co. v. FrankPerrotti Sons, Inc., 20 Conn. App. 253, 259 (1989). Upon a review of the evidence, the court finds that for both plaintiffs, the necessary element of causation was not established.
The defendant did not have a large complement of permanent employees. Frequent meetings of the managers were hosted by Perillo which Sledge and sometimes Crisafi attended. Many memos passed between them. At the beginning of Perillo's tenure he held weekly meetings with Sledge and Crisafi. In sum, Perillo knew Sledge and Crisafi quite well.
Crisafi testified that Perillo would "ride" them for structural defects such as water leaks or if a patron fell. Crisafi also said that he and Sledge always argued with Perillo. CT Page 5316-SSS He used phrases such as "it was him versus us." Sledge testified in the same vein when he said. "Perillo would have complained about anything I did." Perillo stated that in his opinion there was a lack of cooperation by Sledge and Crisafi.
More objectively, the court finds that although Sledge and Crisafi, until the end of their respective employments, remained in the defendant's table of organization as manager and assistant manager of the garage, they, in fact, became subordinate to Vincent Wiel, the operations manager in 1987 and 1988. As a plaintiffs' witness, Vincent Wiel testified in direct examination that he became the person ultimately responsible for Sledge; that he told Sledge what to do; that Perillo gave him this assignment in 1987 or 1988. In light of Wiel's testimony, the court cannot credit Sledge's claim that his job was similar to the position of Director of Security or that of Manager of Concessions. Further, the court finds that Crisafi's reference to "general booking," a function supposedly performed by Grace Proto, Peter Pietruszka and Kenneth Parks as well as himself, too sparse for an informed comparison between their jobs and his.
The relationship that Sledge and Crisafi had with Perillo was poor. Rightly or wrongly he did not think much of their work or their attitude. Formalistic adherence to annual performance evaluations and wage and benefit reviews would not have changed a situation with which all parties were familiar. The court should no more interfere in this compensation dispute than it should in the discharge of an at-will employee for reasons unconnected with any implied contract or with public policy. Magnan v. AnacondaIndustries. Inc., supra at 572.
The court concludes that the breach of the right given to the plaintiffs to have annual performance evaluations and wage and benefit reviews was not the cause for their wages that were lower and their increments that were at times less than those received by other management employees. Without causation, the plaintiffs simply have no case. See Lombardi v. J.A. Bergren Dairy Farms,Inc., 153 Conn. 19, 22 (1965); Davis v. Fitzpatrick's Inc.,5 Conn. App. 469, 472 (1985).
 III.
Judgment is rendered for the defendant.
Barnett, J. CT Page 5316-TTT