**Jia CHEN, Plaintiff,**

v.

**PITNEY BOWES CORPORATION, Defendant.**

**No. 3:01CV56(JBA).**

United States District Court, D. Connecticut.

March 7, 2002.

---

**5.** Crim. no. 97–032(HL), docket no. 429, at 3.

Daniel H. Kryzanski, Gesmonde, Pietresimone, Sgrignari, Pinkus & Sachs, Hamden, CT, for Plaintiff.

Robert J. Gallo, Cummings & Lockwood, Hartford, CT, Marc L. Zaken, Cummings & Lockheed, Stamford, CT, for Defendant.

### Ruling on Defendant's Motion for Summary Judgement
### [Doc. # 14]

ARTERTON, District Judge.

This suit is the sequel to Jia Chen's original nine-count complaint against his former employer, Pitney Bowes ("Pitney"), alleging federal claims, under the Age Discrimination in Employment Act, the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964; and state law claims of breach of contract, breach of the implied duty of good faith and fair dealing, promissory estoppel, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent misrepresentation. The original case was assigned to the Hon. Ellen Bree Burns, who granted summary judgment to Pitney on all of Chen's federal claims and declined to exercise supplemental jurisdiction over the remaining state law claims.[1]

The instant suit consists only of Chen's state law claims, which he re-filed in state court, and which Pitney then removed to federal court, claiming diversity of citizenship. Pitney has again moved for summary judgment, arguing that Chen is collaterally estopped from asserting all of his claims by virtue of Judge Burns's grant of summary judgment in the prior case. Alternatively, Pitney argues that it is entitled to summary judgment on each claim even without the aid of the doctrine of collateral estoppel, as there is no genuine issue of material fact left to be tried and

---

1. Diversity of citizenship was not claimed as a basis for jurisdiction in the first suit.

Pitney is entitled to judgment as a matter of law.

For the reasons set out below, the Court grants Pitney's motion as to Chen's claims for breach of contract, breach of the implied duty of good faith and fair dealing, promissory estoppel, and intentional infliction of emotional distress, but denies summary judgment as to Chen's claims of negligent misrepresentation and negligent infliction of emotional distress.

## I. Standard

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the nonmoving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

When deciding a motion for summary judgment, " 'the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *citing United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading." Fed. R.Civ.P. 56(e).

## II. Facts

Jia Chen began working for Pitney in 1983, where he assembled postage meters. In 1989 Chen was diagnosed with psychiatric and physical disabilities, including severe depression, for which he took a leave of absence in 1996 that was thereafter approved as a long-term disability leave. Chen's leave was subsequently extended through September 30, 1997.

Prior to Chen's 1996 leave of absence, Pitney began testing all employees in Chen's job classification for English literacy. Pitney claims that this testing was part of a comprehensive workforce transition program resulting from a change in the type of postage meters it manufactures. After Chen failed the literacy test three times, he was selected for layoff in a reduction in force that Pitney claims was necessitated by increased automation that required a higher level of interpersonal communication. However, by the time the list of laid off employees was finalized, Chen was already out on long-term disability leave. Pitney claims that because it is its policy not to fire anyone while on long-term disability leave, Chen was not notified at that time that his employment would be terminated when his leave concluded.

In September 1997, Chen was to return to Pitney on a reduced schedule. During Chen's leave, Dr. Hu, Chen's physician, had communicated with Ann Romanello, the Pitney nurse employed by Pitney who was handling Chen's claim for disability

benefits. In time, Hu told Romanello that Chen had improved and that returning to work would be of therapeutic benefit to Chen, and Romanello instructed Chen to return to work.[2] When Chen did as requested by Romanello and reported to work on September 29, 1997, Angela Sposato, a human resources representative told him (through a translator) that he was being fired because he had failed the English tests years before. Chen thereafter regressed deeper into depression.

## III. Analysis

The parties have a fundamental disagreement regarding the scope and effect of Judge Burns's ruling granting summary judgment on the federal claims. According to Pitney, Judge Burns made binding "findings of fact" that conclusively determine this entire action. According to Chen, Judge Burns's ruling has no effect at all on the present case, which consists entirely of state law claims, because she expressly declined to exercise jurisdiction over those claims.

Both parties' positions are too extreme. First, the factual rendition of Judge Burns's opinion granting summary judgment sets out the factual predicate for such a ruling under Fed.R.Civ.P. 56, i.e., those material facts which have not been called into genuine dispute by rebutting evidence; it does not make "findings of fact" as required when the Court issues a ruling following a bench trial under Fed. R.Civ.P. 52. However, contrary to Chen's position, summary judgment in the earlier case has conclusively established that plaintiff's claim that Pitney's termination discriminated against Chen on the basis of his race, disability or age lacked evidentiary basis.

A. Breach of Contract, Breach of Implied Duty of Good Faith, and Promissory Estoppel

According to Chen's complaint, "[t]he Defendant's personnel policy, memorandums [sic], statements by it's [sic] Human Resources Department employees and its words, actions and conduct toward the Plaintiff created a contract between the Plaintiff and Defendant containing certain terms and conditions," Compl. ¶ 26, which the defendant breached. The first three counts of Chen's complaint rely on these alleged promises: count one claims breach of contract; count two claims that by virtue of that breach, Pitney concomitantly breached the implied duty of good faith and fair dealing that inheres in every contract; and count three alleges promissory estoppel, claiming that Chen relied upon Pitney's promises to his detriment.

"[A]ll employer-employee relationships not governed by express contracts involve some type of 'implied' contract of employment." *Torosyan v. Boehringer Ingelheim Pharm.*, 234 Conn. 1, 13, 662 A.2d 89 (1995), *citing* 1 H. Perritt, Employee Dismissal Law and Practice (3d ed.1992) § 4.32 ("There cannot be any serious dispute that there is a bargain of some kind; otherwise, the employee would not be working."). The terms of these contracts are determined in accordance with standard contract principles of of offer and acceptance:

> Initially, the trier of fact is required to find that the employer's oral representations or issuance of a handbook to the employee was an "offer"—i.e., that it was a promise to the employee that, if the employee worked for the company, his or her employment would thereafter be governed by those oral or written statements, or both .... [T]he trier of

**2.** Chen Dep. at 28–29.

fact is then required to find that the employee accepted that offer.
*Torosyan,* 234 Conn. at 13–14, 662 A.2d 89.

Chen appears to have two operative theories of promises made by Pitney. First, Chen alleges that there is an implied, "cause only" termination provision that provides that Chen could only have been fired for cause. Second, Chen claims that he was promised he could return to work at the conclusion of his disability.

### 1. For Cause Termination

■ While the "general rule" is that any employment contract can be terminated without cause, this default rule can be modified by the parties." *Torosyan,* 234 Conn. at 14–15, 662 A.2d 89 ("[T]he default rule of employment at will can be modified by the agreement of the parties"), *citing D'Ulisse–Cupo v. Board of Directors of Notre Dame High School,* 202 Conn. 206, 211 n. 1, 520 A.2d 217 (1987). To prevail on a breach of contract claim alleging the existence of an implied contractual term of dismissal only for cause, "the plaintiff [has] the burden of proving by a fair preponderance of the evidence that the employer had agreed, either by words or action or conduct, to undertake some form of actual contractual commitment to him under which he could not be terminated without just cause." *Torosyan,* 234 Conn. at 15, 662 A.2d 89, *quoting D'Ulisse–Cupo,* 202 Conn. at 212 n. 2, 520 A.2d 217, and *citing Therrien v. Safeguard Mfg. Co.,* 180 Conn. 91, 94–95, 429 A.2d 808 (1980).

■ The only evidence identified by Chen to establish the existence of an implied contract for cause termination is an excerpted portion of Pitney's employee handbook. The portion of handbook entitled "Corrective Action Procedures" contains the following language: "Certain infractions may result in immediate dismissal for cause. Generally, these offenses are so serious that an employee may be terminated without written notice."

In response to this exhibit, the defendant offers the disclaimer portion of that same handbook:

> Employees of Pitney Bowes are employed at will. This legal concept means that an employee has the right to terminate his or her employment for any reason at any time.... Pitney Bowes has the same rights regarding the employment relationship as you do, and we note it here so that no misunderstanding exists between us. Any statements or promises to the contrary are not to be relied upon.

■ Given this unambiguous at-will language, the subsection referenced by Chen does not serve as a contractual modification of the express at-will term of Chen's employment. While Pitney clearly could not rely on this at-will provision as a lawful basis for firing Chen because of his race, age, disability or other public policy violation, *see, e.g., Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 427 A.2d 385 (1980), Judge Burns's ruling precludes any claim by Chen that his termination was the result of such unlawful discrimination. Any other theory—whether breach of contract, breach of implied duty of good faith and fair dealing, or promissory estoppel—based on an implied "cause only" termination provision in the contract therefore fails in the absence of evidence from which a fact-finder could conclude that the parties abrogated the at-will employment relationship.

### 2. Promise to Allow Chen to Return to Work

■ Chen's second theory of contractual obligation is that he and Pitney had an agreement, formed in September 1997,

that he would be returned to part-time employment. In support of this theory, Chen points to a series of letters from Pitney's Human Resources Department regarding Chen's long term disability leave. The first letter, dated February 1, 1996, indicates that Chen is "expected to return to work on the first normally scheduled workday following the expiration" of his long term disability status. Pl.'s Ex. 4 [Doc. # 21]. Next, there are a series of internal notes from Pitney's disability office regarding Chen's disability claim. One of the notes indicates that Chen will be returning to work in September 1997: "Tc with Dr. Hu, [Chen] in office at the time. Stated [Chen] will rtw on Monday from 4–8, asked [Chen] to come in to meet with Angela Sposato, hr at 3:30pm. [Chen] informed and plans on being here at 3:30. /amr" Pl.'s Ex. 6 [Doc. # 21]. Finally, Chen points to a letter from Dr. Hu that states, "The decision had been made that Mr. Chen may benefit from returning [to] his job at a reduced time, responsibility, and pressure schedule." Pl's Ex. 14 [Doc. # 21].

Additionally, Chen gave the following testimony at his deposition:

Q: When you went back to work in September 1997, were you told that you were being fired because you did not pass the literacy test?

A: Yes.

Q: Did Angela Sposato tell you that?

A: Angela was the person told me to go back to work. [It appears Chen confused Ann Romanello with Angela Sposato—see below.]

Q: When did Angela tell you to go back to work?

A: I don't know whose Angelo, all I knew was a nurse.

Q: Was the nurse who told you to go back to work Ann Romanello?

A: It's a woman?

Q: Yes.

A: I'm not quite sure. Possibly, that's she. Because she told the doctor, the doctor told me.

Q: The doctor told you you were well enough to go back to work?

A: No. He said that my illness would benefit from working.

Q: Your doctor told you it would be good for you to go back to work so that you would get better?

A: It will help, yes.

Q: And then the nurse from Pitney Bowes said it was okay for you to come back to work?

A: Okay. Told me to go back four hours and try.

Q: And then when you showed up at work, someone else told you to go home, you were being fired because you did not pass the literacy test?

A: Yes

Chen Dep. at 28–29.

Chen argues that the above evidence shows that Pitney promised Chen that he could return to work part time, because it would be therapeutic. In reliance on this, he ended his leave of absence, reported to Pitney for work, was terminated, and stopped receiving his disability payments, *see* Chen Dep. at 15 (the disability checks stopped "around the time they sent me home"), even though Chen was not sufficiently recovered for full time work when he attempted to return to work. Under this theory, the promise was that Chen could return to work at a reduced schedule, as this would be therapeutic for him and presumably beneficial to the company, and was breached when Pitney did not allow Chen to return to work.

The problem with Chen's theory is that in opposition to summary judgment, Chen comes forward with nothing that rebuts the declaration that no promise was made by Pitney that Chen would actually be returned to employee status. Ann Romanello's carefully worded affidavit states that "[a]t no time while Plaintiff was out on disability, did I make any promises to Dr. Hu concerning Plaintiff's future employment at Pitney Bowes." Romanello Aff. ¶ 9. No deposition of Romanello was introduced either supporting or opposing this motion for summary judgment. The evidence does indicate that Pitney was monitoring Chen's condition to determine his medical capacity for returning to work—i.e., whether he continued to qualify for disability benefits. Pitney's disability office's use of the term "return to work," abbreviation "r.t.w.," (meaning "return to work") is insufficient to support an inference of any actual promise of continued employment made to Chen.

While both Chen and Dr. Hu understandably equated being capable of returning to work with being entitled to return to work since they had no idea Chen had been designated for layoff, any such belief on their part of guaranteed continued employment was wholly unilateral, particularly as Pitney had planned all along to terminate Chen's employment at the conclusion of his disability leave. Thus, the record lacks evidence of communications by Pitney to Chen which could support a finding of existence of a contract or promise that Chen would have a job at Pitney when he recovered.

## B.  Negligent Misrepresentation

■ In order to prevail on his claim of negligent misrepresentation, Chen must prove: (1) Pitney supplied false information for his guidance in business transactions; (2) he justifiably relied on that information; and (3) Pitney failed to exercise reasonable care and competence in obtaining or communicating the information. *Williams Ford, Inc. v. The Hartford Courant Co.,* 232 Conn. 559, 575, 657 A.2d 212 (1995) (citations omitted). "[E]ven an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty to know the truth." *Id.* (citations omitted).

While there is no evidence of a promise or other contractual undertaking on Pitney's part, the record does contain sufficient evidence from which a jury could find that Pitney negligently misrepresented to Chen that he would be returning to work at the company upon completion of his disability leave, and that Pitney knew when it fired Chen on September 29, 1997 that Chen was under a mistaken belief that he was returning to work. There are two bases upon which the jury could find such misrepresentations: (1) direct evidence of misrepresentation, in the letters sent by Romanello to Chen, and (2) circumstantial evidence of misrepresentation, based on Romanello's disability progress notes.

### 1.  Direct Evidence in the Record

In a February 1, 1996 letter to Chen, which appears to be the first communication Chen received from Pitney regarding his disability leave, Romanello wrote:

You are expected to return to work on the first normally scheduled workday following the expiration date noted above. When you return to work, or if you return to work prior to your scheduled date, please have a written authorization form from your doctor. If you work in the Main Plant, World Headquarters, or Danbury please call the appropriate Medical Center to set up an appointment for clearance to return to

work (remember to bring your doctor's return to work note with you).

Pl.'s Ex. 4 [Doc. # 21] (emphasis deleted). After this initial communication, containing the baseline premise that Chen would be returning to employment upon expiration of his disability leave, Pitney sent Chen a series of letters extending the dates of his disability leave. While these subsequent letters are silent on the subject of Chen's employment status at Pitney upon return, they may reasonably be seen as only a modification of the "effective date" noted in the initial letter, not any other terms. Thus, the first letter's instruction to Chen that Pitney expected him to report for work upon conclusion of his disability could be found to constitute a standing direction to Chen, on which he reasonably relied.

### 2. Circumstantial Evidence

Beyond these letters, there is no direct evidence in the record of precisely what Romanello said to Chen via Dr. Hu regarding Chen's return to work at Pitney. There is, however, evidence—in the form of Romanello's progress notes regarding Chen's case—from which a jury could infer the substance of Romanello's communications to Dr. Hu.

In order to grasp the import of Pitney's internal notes, it is necessary to place them in context. In mid–1997, it became clear that Chen's situation was improving at least slightly. Romanello's notes indicate that "[Chen] is determined to [return to work]," Pl.'s Ex. 6 [Doc. # 21] (notes of June 12, 1997), and that Romanello had been in more frequent contact with Dr. Hu regarding changes in Chen's condition. From her progress notes it is apparent that as late as September 19, 1997 she was unaware that Chen would not have a job when he returned. *See* Pl.'s Ex. 6 [Doc.

# 21] (notes of September 19, 1997). The previous entry of September 9, 1997 notes that either Romanello or Dr. Hu will continue to follow Chen's progress after he returns to work, and that she "[w]ill explore options for this [employee]." Pl.'s Ex. 6 [Doc. # 21] (notes of September 19, 1997). Earlier, she noted that vocational training was an option. Pl.'s Ex. 6 [Doc. # 21] (notes of July 28, 1997).

These progress notes are important because they reveal that during the time Romanello was speaking with Dr. Hu and making plans for Chen's cessation of disability benefits, she herself believed that Chen would have a job upon return. The combination of this fact (Romanello's unawareness of Chen's upcoming termination) and Romanello's somewhat rosy assessment of Chen's possibilities at the company (such as the possibility of rehabilitative therapy) provides a sufficient basis for a jury to infer that when Romanello spoke with Dr. Hu, she inaccurately conveyed to him (and thus to Chen) however unintentionally that Chen would in fact be returning to work at Pitney, when all the while Pitney (although not Romanello) knew this was false.

With this inference in mind, other evidence in the record may take on a different light. Specifically, the portion of Chen's deposition testimony that characterizes his return to work as somewhat therapeutic in nature[3] is corroborated by Romanello's progress note entries that she was considering vocational training in light of Chen's functional status, Pl.'s Ex. 6 [Doc. # 21] (notes of July 28, 1997), and, when Dr. Hu indicated that Chen would likely be able to return to work only on a part time basis, that she planned to "explore options" for Chen, Pl.'s Ex. 6 [Doc.

---

**3.** Chen Dep. at 28 ("Q: Your doctor told you it would be good for you to go back to work so that you would get better? A: It will help, yes.").

# 21] (notes of September 9, 1997). Given these progress notes that Romanello wrote, a reasonable jury could infer that as she spoke with Dr. Hu, she conveyed the understanding she had at the time that Chen would, in fact, have employment upon his return, and that Hu, in turn, related this to Chen.

### 3. The Romanello Affidavit

Pitney claims that any representations made by Ann Romanello were related solely to his capacity to return to work, and not his future employment prospects with Pitney. Second, Pitney claims that Romanello was not an authorized human resources representative, and thus lacked authority to make representations to Chen about his future with the company. In support of these claims, Pitney cites Romanello's affidavit, which states:

> In January of 1996, after Plaintiff went out on disability leave, I was assigned to handle Plaintiff's claim for disability benefits. In this capacity, I was responsible for communicating with Plaintiff's doctor to determine how long Plaintiff would be out of work and when he would be able to return to work. My only role was to determine when Plaintiff was well enough to return to work. I was not in any way responsible for what would happen to Plaintiff upon his return to work.

Romanello Aff. ¶ 5 (attached to Def.'s Local R. 9(c)(1) Statement [Doc. # 16] ).

Even assuming that Romanello's use of words such as "can" (as in, hypothetically, "Chen can return to work") indicated only that Chen was medically-capable of returning to work, the record is devoid of any indication that Romanello ever clarified to Chen or Dr. Hu that her use of "return to work" meant only ability to work and connoted nothing about future employment prospects at Pitney. To Chen and Dr. Hu, Pitney's communications through Romanello about Chen's return to work connoted their commonsense meaning: that Chen was allowed to return to work at Pitney, particularly given Pitney's instructions in the February 1, 1996 letter regarding when and where to return to work.

■ Finally, Pitney's effort to draw a material distinction between words spoken by its employee benefits personnel and its human resources personnel is unavailing, absent any indication to non-English speaking Chen that there were different nuances to the word choices used by Pitney's different officers. It is undisputed that Romanello was the only source of Chen's information about his job while he was on disability leave, since her affidavit indicates she was responsible for managing his disability claim. While Pitney's internal corporate structure may not confer on Romanello actual authority to make employment decisions, a reasonable jury could conclude that Romanello had *apparent* authority over such matters. *See, e.g., Lewis v. Michigan Millers Mutual Ins. Co.*, 154 Conn. 660, 665, 228 A.2d 803 (1967) ("Apparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses"), *citing Quint v. O'Connell*, 89 Conn. 353, 357, 94 A. 288 (1915).

The Court concludes that plaintiff's evidence is sufficient for a reasonable jury to conclude that Pitney supplied false information (namely, that Chen would have a job at the conclusion of his disability leave) without reasonable care for its accuracy. From the evidence in the record, including the February 1, 1996 letter specifically directing Chen to report to work and the circumstantial evidence from which a jury could infer that Romanello's conversations with Dr. Hu contained misinformation re-

garding Chen's return to work, there are genuine issues of material fact that preclude summary judgment on this claim. A jury must decide: (1) what if any false information Pitney gave to Chen regarding his return to work; (2) whether Chen justifiably relied on those misrepresentations, believing that he was returning to work; and (3) taking the communications and conduct of Pitney in the aggregate, whether under the circumstances Pitney failed to exercise reasonable care and competence in obtaining or communicating the information to Chen.

### C. Intentional Infliction of Emotional Distress

In *Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986), the Connecticut Supreme Court explained the elements of a claim for intentional infliction of emotional distress:

It must be shown: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe.

*Id.* at 253, 510 A.2d 1337, *citing, inter alia,* Restatement (Second) of Torts § 46 (quotations omitted). An examination of the pedigree[4] of this "knew or should have known" mental state articulated in *Petyan* shows that it is to be read within the

formulation of the requisite mental state in § 46 of the Restatement (Second) of Torts, the commentary of which provides:

The rule stated in this Section applies where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct. It applies also where he acts recklessly, as that term is defined in § 500, in deliberate disregard of a high degree of probability that the emotional distress will follow.

■■■ Given this *mens rea* standard, Chen's intentional infliction of emotional distress claim must fail. There is nothing in the record from which it could be inferred that Pitney's actions or misrepresentations were made: (1) with the intent to cause Chen emotional distress; (2) with the virtual certainty that such distress would result; or (3) recklessly, in deliberate disregard of a high degree of probability that the emotional distress would follow.

### D. Negligent Infliction of Emotional Distress

■■■ "In order to recover on a claim of negligent infliction of emotional distress, the plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm." *Gomes v. Commercial Union Ins. Co.,* 258 Conn. 603, 783 A.2d 462 (2001). As the claim is one for negligence, the conduct must be unreasonable in order

---

**4.** When setting out the elements of the tort, the *Petyan* court quoted verbatim from *Murray v. Bridgeport Hosp.,* 40 Conn.Supp. 56, 62, 480 A.2d 610 (1984), which in support of its formulation of the elements cited to the Restatement (Second) of Torts § 46, as well as *Hiers v. Cohen,* 31 Conn.Supp. 305, 329 A.2d 609 (1973). *Hiers,* in turn, cites to the Restatement, among other sources, for its con-

clusion that "intentionally inflicting emotional disturbances on another may constitute a common-law tort in this state." *Id.* at 310, 329 A.2d 609. Given that all authority on this point references back to the Restatement, there is no reason to believe that the Connecticut Supreme Court has grafted a negligent state of mind requirement onto an intentional tort.

to serve as a basis for liability. *See id.* at 472 (using the familiar rubric of duty, breach, causation and injury when analyzing claim for negligent infliction of emotional distress); *Parsons v. United Technologies Corp.,* 243 Conn. 66, 89, 700 A.2d 655 (1997) (holding that employer's actions in terminating employee were not so unreasonable as to support cause of action for negligent infliction of emotional distress); *see also Temple v. Gilbert,* 86 Conn. 335, 85 A. 380 (1912) ("Negligence is the failure to use that degree of care for the protection of another that the ordinarily reasonably careful and prudent man would use under like circumstances").

In essence, this claim is linked to Chen's claim of negligent misrepresentation. Reasonable jurors could find from the evidence that Pitney was negligent in its communications of false information to Chen regarding his future at the company, and could also conclude that arranging for Chen to receive in person notice of his termination in light of those misrepresentations, knowing that he thought he was returning to work, involved an unreasonable risk of causing severe emotional distress. It is undisputed that Pitney was aware of Chen's fragile emotional state, particularly as demonstrated by its arrangements to have a representative from its employee assistance program on hand for the termination meeting, and its preparations to telephone Dr. Hu afterwards. It is also undisputed that Chen suffered severe distress from his termination. While Pitney argues that *Parsons* forecloses negligent infliction of emotional distress claims that arise wholly from the universally unpleasant fact of involuntary termination of employment, under these circumstances a jury could conclude that Pitney is liable to Chen for negligent infliction of emotional distress based on its conduct surrounding Chen's disability leave and his return to work and the method of his termination.

## IV. Conclusion

For the reasons set out above, the defendant's motion for summary judgment [Doc. # 14] is GRANTED IN PART AND DENIED IN PART. Summary judgment is granted as to all claims other than negligent misrepresentation and negligent infliction of emotional distress.

IT IS SO ORDERED.